**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | CIVIL ACTION NO. |
| v. | ) | 1:07-CV-00387 |
| | ) | |
| OXFORD PAINTING CO. | ) | |
| a/k/a Oxford Painting, Co. et al. | ) | |
| | ) | |
| Defendants | ) | |

**MOTION FOR ENTRY OF DEFAULT JUDGMENT**

Plaintiff, the International Painters and Allied Trades Union Industry Pension Fund

("Pension Fund" or "Plaintiff"), respectfully moves this Court for entry of judgment by default

against Defendants, Oxford Painting Co. a/k/a Oxford Painting, Co. ("Company") and Terry S.

Crawford ("Individual Defendant" and together with Company, "Defendants"), jointly and

severally, in the amount of $29,954.95, which includes contributions, interest, liquidated

damages and attorneys' fees and costs incurred by the Pension Fund pursuant to 29 U.S.C.

§185(a) and 1132(g)(2)(A) through (D), and for injunctive relief.

In support of this Motion, Plaintiff relies upon the allegations in its Complaint, the

Declaration of Thomas Montemore[1] and the Declaration of Sanford G. Rosenthal.[2]

The grounds for this Motion are as follows:

1.     Prior to the commencement of this action, the Plaintiff attempted to resolve this

delinquency in an amicable manner.

---

[1]     The Declaration of Thomas Montemore ("Montemore Declaration") is attached to this Motion as Exhibit 1. The exhibits referenced in the Montemore Declaration are attached as Exhibits 2-3.

[2]     The Declaration of Sanford G. Rosenthal ("Rosenthal Declaration") is attached to this Motion as Exhibit 4. The exhibits referenced in the Rosenthal Declaration are attached to this Motion as Exhibits 5-7.

182452-1

2.      The requested payments were not received and the Complaint in this matter was filed on February 20, 2007.  The Complaint was served on Defendants on April 4, 2007 as appears from the Affidavits of Service duly filed with the Court.

3.      No Answer to the Complaint has been filed by the Defendants.

4.      On April 30, 2007, Plaintiff filed a Request to Clerk to Enter Default against the Defendants pursuant to Fed. R Civ. P. 55(a). A copy was sent via first-class mail, postage prepaid, to the Defendants.

5.      On May 1, 2007, the Clerk of the Court entered default against all Defendants.

6.      Defendants are neither infants nor incompetent people and the Individual Defendant is not in the military service.

**WHEREFORE**, Plaintiff seeks the following relief:

(a)      Judgment entered as set forth in the proposed Order and Judgment attached to this Motion; Such other and further relief as the Court deems just, necessary and appropriate.

Respectfully submitted,

JENNINGS SIGMOND, P.C.
 /s/ Sanford G. Rosenthal
SANFORD G. ROSENTHAL
Bar No. 478737
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0611/0660
Attorneys for the Fund

Date: May 4, 2007
OF COUNSEL:
JEROME A. FLANAGAN
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0660

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL PAINTERS AND ALLIED   )
TRADES INDUSTRY PENSION FUND       )
                                         )
                    Plaintiff        )      CIVIL ACTION NO.
    v.                           )      1:07-CV-00387
                                         )
OXFORD PAINTING CO.                )
    a/k/a Oxford Painting, Co. et al.       )
                                       )
                Defendants    )

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT BY DEFAULT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 55(b) AGAINST DEFENDANTS.

Plaintiff, the International Painters and Allied Trades Union Industry Pension Fund ("Pension Fund" or "Plaintiff"), by its legal counsel, submits this Memorandum of Law in Support of its Motion for Judgment by Default.[1]

The Plaintiff served its Complaint on Defendants, Oxford Painting Co. a/k/a Oxford Painting, Co. ("Company") and Terry S. Crawford ("Individual Defendant" and together with Company, "Defendants"), on April 4, 2007. To date, Defendants have failed to answer the Complaint or otherwise defend this action. On April 30, 2007, Plaintiff filed a Request For Entry of Default against Defendants pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. The default was entered against all defendants on or about May 1, 2007.

In light of Defendants' default and Defendants' continuing failure to appear or otherwise defend, the Pension Fund is entitled to judgment by default against Defendants without a hearing. Fed. R. Civ. P. 55(b); United States v. De Frantz, 708 F. 2d 310 (7th Cir. 1983);

---

[1] Attached to the Motion accompanying this Memorandum are the Declarations of Thomas Montemore ("Montemore Declaration") and Sanford G. Rosenthal ("Rosenthal Declaration"). Also attached is a proposed form of Default Judgment.

Draisner v. Liss Realty, 211 F. 2d 808 (1954). Moreover, where defendants, such as those here,

fail to respond to the Complaint, all factual allegations in the Complaint are deemed admitted.

Thomson v. Wooster, 114 U.S. 104 (1885); Au Bon Pain Corp. v. Artect, Inc., 653 F 2d 61 (2d

Cir. 1981); U.S. ex. Rel. v. Carr, 567 F. Supp. 831, 840 (W.D. MI 1983). General allegations of

fact are also deemed true. Danning v. Lavin, 572 F. 2d 1386, 1388-89 (9th Cir. 1978)

(allegations of insolvency pled in general terms held sufficient to support a finding of fraudulent

conveyance or voidable preference).

Defendants were and have been party to collective bargaining agreements (singly or

jointly "Labor Contracts") with the various local unions and district councils affiliated with the

International Union of Painters and Allied Trades, AFL-CIO-CFC ("International" or "Union").

See, Exhibit 1, Montemore Declaration, ¶6; Exhibit 2, true and correct copies of relevant

provisions from the Labor Contracts. Under the Labor Contract, Defendants are required to remit

fringe benefit contributions and other sums to Plaintiff. See, Exhibit 1, Montemore Declaration,

¶¶6-7; Exhibit 2, Labor Contracts. The failure to pay these fringe benefit contributions and other

amounts results in a delinquency to the Plaintiff.

In addition, prior to the commencement of this lawsuit the Pension Fund and the

Defendants entered into a settlement agreement in an effort to collect amounts owed to the

Pension Fund by Defendants. The agreement was reached in November 2005. Pursuant to the

terms of the Promissory Note ("Note") and Personal Guarantee ("Guarantee") executed on

November 15, 2005, by Individual Defendant, the Pension Fund settled the delinquencies and

was to receive payments totaling $16,354.40. Defendants defaulted on the Note as a result of

failing to pay the monthly installments and current contributions. True and correct copies of the

Note and Guarantee are attached as Exhibit 3.

## ARGUMENT

**A.    ENTRY OF JUDGMENT AGAINST DEFENDANTS, JOINTLY AND SEVERALLY, FOR UNPAID CONTRIBUTIONS, INTEREST, LIQUIDATED DAMAGES AND ATTORNEYS' FEES AND COSTS IS ENTIRELY APPROPRIATE**

Defendants are parties to one or more Labor Contracts with the Union. See, Exhibit 1, Montemore Declaration, ¶6; Exhibit 2, Labor Contracts. The Labor Contracts provide for the payment of contributions to the Pension Fund for time worked by or paid to employees who perform work covered by its terms and conditions. See, Exhibit 1, Montemore Declaration, ¶7; Exhibit 2, Labor Contracts. Failure to make these contributions, or to submit either incorrect or late remittance reports, results in a delinquency to the Pension Fund. Ibid. Under the Labor Contracts, the Pension Fund also has the right to audit the signatory's payroll books and related records to determine that all of the required contributions have been paid. See, Exhibit 1, Montemore Declaration, ¶¶6,13; Complaint, Exh. 1; Exh.2, Labor Contracts.  Finally, under the terms of the Labor Contracts, the employer agrees to be bound by the Agreement and Declaration of Trust of the Pension Fund ("Trust Agreement," attached as Exhibit 1 to the Complaint filed in this matter and incorporated by reference) and the International Painters and Allied Trades Industry Pension Plan ("Plan," attached as Exhibit 2 to the Complaint filed in this matter and incorporated by reference) and by all amendments thereto and actions taken by the trustees of the Pension Fund. See, Complaint, ¶¶ 8-9; Exhibit 1, Montemore Declaration, ¶6; Exhibit 2, Labor Contracts.

Furthermore, Section 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1145, provides:

> Every Employer who is obligated to make contributions to a bargained agreement shall … make contributions in accordance with … such agreement.

If an employer fails to make the contributions as required by the collective bargaining agreement and Section 515 of ERISA, then the employer is subject to the provisions of Section 502(g)(2) of ERISA, 29 U.S.C. § 1132(g)(2). Section 502(g)(2) provides for the mandatory award of the following if a judgment is entered in the Pension Fund's favor pursuant to Section 515:

A.   the unpaid contributions;

B.   interest on the unpaid contributions;[2]

C.   an amount equal to the greater of:

    (i)   interest on the unpaid contributions; or

    (ii)  liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the Court under subparagraph (a);[3]

D.   reasonable attorneys' fees and costs of the action, to be paid by the Defendants; and

E.   such other legal or equitable relief as the court deems appropriate.

Company has defaulted on the Agreement and failed to submit contributions for the period October 2005 through December 2005, April 2006, August 2006 and has failed to submit contributions and remittance reports for the period November 2006 through March 2007. See, Exhibit 1, Montemore Declaration, ¶8-9. As a result, Plaintiff is entitled to judgment in at least the amount of $29,954.95.

---

[2]   Section 10.12(b)(2) of the Plan sets the interest rate on delinquent contributions according to the Internal Revenue Service rate for delinquent taxes. See, Complaint, Exhibit 2.

[3]   ERISA and §10.12(b)(3) of the Plan's rules and regulations mandate that liquidated damages be awarded in an amount equal to the greater of interest or twenty percent (20%) of unpaid contributions due at the commencement of the lawsuit and those which become delinquent during the course of the litigation. See, Complaint, Exhibit 2. Article VI, Sec. 4 of the Trust Agreement also provides for the assessment of liquidated damages on contributions paid after the due date. See, Complaint, Exhibit 1.

1.    **Defendants owe contributions in at least the amount of $21,316.58**

Defendants have failed to submit the required contributions for the period of October

2005 through December 2005, April 2006 and August 2006 in the total amount of $1,408.93.

See Exhibit 1, Montemore Declaration, ¶9. Defendants have also failed to submit contributions

for the period November 2006 through March 2007 in the estimated amount of $19,907.65. See

Exhibit 1, Montemore Declaration, ¶9. This amount is estimated because the Defendants have

failed to submit the contractually-required remittance reports. The estimated contributions are

calculated by the Pension Fund based on the average of the last three months of remittance

reports filed by Company. See, Exhibit 1, Montemore Declaration, ¶9. Therefore, Defendants

owe a total of at least $21,316.58 in contributions.

2.    **Defendants owe interest in the amount of $397.81**

The rules and regulations as set forth in §10.12(b)(2) of the Plan set the interest rate on

delinquent contributions according to the Internal Revenue Service rate for delinquent taxes.

Interest accruing through April 30, 2007 on Defendants' delinquent contributions totals $397.81.

See, Exhibit 1, Montemore Declaration, ¶10; 29 U.S.C. §1132(g)(2)(B); 26 U.S.C. §6621.

Interest will continue to accrue until the amounts are paid.

3.    **Defendants owe liquidated damages in the amount of $4,263.32**

ERISA and §10.12(b)(3) of the Plan's rules and regulations mandate that liquidated

damages be awarded in an amount equal to the greater of interest or twenty percent (20%) of

unpaid contributions due at the commencement of the lawsuit and those which become

delinquent during the course of the litigation. Article VI, Sec. 4 of the Pension Fund's Trust

Agreement also provides for the assessment of liquidated damages on contributions paid after the

due date. The total amount of liquidated damages is $4,263.32. The amount of liquidated

damages is greater than the interest due ($397.81). Therefore, Defendants owes $4,263.32 in

liquidated damages. See, Exhibit 1, Montemore Declaration, ¶11; 29 U.S.C. §1132(g)(2)(C).

4.     **Defendants owe attorneys' fees in the amount of $3,977.24**

Plaintiff has incurred $3,977.24 in attorneys' fees and costs in connection with this matter

through May 3, 2007. See, Exhibit 4, Rosenthal Declaration, ¶2; Exhibit 5. See, 29 U.S.C.

§1132(g)(2). The Pension Fund is entitled to reimbursement of all attorneys' fees and costs it

incurs in connection with the enforcement and collection of any judgment entered by the Court.

See, International Painters and Allied Trades Industry Pension Fund v. H.W. Ellis Painting Co.,

Inc., No. 03-1125, slip. op. at *3 (D.D.C. February 10, 2004) (citing Free v. Briody, 793 F.2d

807 (7th Cir. 1986); Trucking Employees of North Jersey Welfare Fund, Inc. v. Bellezza Co., 57

Fed. Appx. 972 (3d Cir. 2003); Sheet Metal Workers Health and Welfare Trust Fund v. Big D

Service Co., 867 F.2d 852 (10th Cir. 1989)).  Therefore, Defendants owe $3,977.24 in attorneys'

fees and costs.

5.     **The Pension Fund is entitled to injunctive relief**

The failure of Defendants to comply with their contractual and statutory obligations

results in a substantial adverse impact on the Pension Fund's ability to meet its legal obligations.

The Pension Fund is obligated by express mandates of ERISA and by the documents and

instruments by which it is administered to provide benefits and pension credits to all of

Company's employees who are otherwise eligible to receive them. 29 C.F.R. 2530-200b-2(a)(1)

and (2); Central States, S.E. & S.W. Areas Pension Fund v. Admiral Merchants Motor Freight,

Inc., 511 F.Supp. 38 (D.Minn. 1980), aff'd sub. nom., Central States, S.E. & S.W. Areas Pension

Fund v. Jack Cole-Dixie Highway Co., Inc., 642 F.2d 1122 (8th Cir. 1981). The Pension Fund is

required to provide these benefits and credits regardless of whether Defendants make the

contributions. For example, if employees perform work covered by the collective bargaining agreement, the Pension Fund has affirmative obligations to credit hours for retirement benefits regardless of whether a signatory employer makes contributions to the Pension Fund. The result of Company's non-compliance with ERISA and the Labor Contract is a significant drain on the Pension Fund's resources.

Additionally, where, as here, Defendants fail to remit their contributions, the Pension Fund loses the income that it would have earned by investing those contributions. Combining this loss of investment income with the Pension Fund's requirement to continue paying benefits to Company's employees (as well as to the employees of other signatory contractors) will eventually affect the actuarial soundness of the Pension Fund as well as deplete the resources available to pay current pension benefits.

Furthermore, the Pension Fund incurs additional administrative expenses as a result of Defendants' failure to pay their contributions. These losses and added expenses significantly impair the Pension Fund's ability to continue to provide benefits to not only Company's employees, but also to employees of companies that comply with their contractual obligations.

In light of Defendants' failure to comply with their contractual and statutory obligations to the Pension Fund to submit timely, accurate remittance reports and pension contributions each month, and the irreparable harm which Defendants' malfeasance causes the Pension Fund, the Pension Fund respectfully requests the injunctive relief which is set forth in its proposed default judgment. Laborers' Fringe Benefit Funds v. Northwest Concrete, 640 F.2d 1350, 1352 (6th Cir. 1981); IBPAT Union and Industry Pension Fund v. Hartline-Thomas, Inc. , 4 EBC 1199, 1200 (D.D.C. 1983); Teamsters Local 639 - Employers Trust v. Jones & Artis Construction Co., 640 F.Supp. 223 (D.D.C. 1986).

**B.    COMPANY SHOULD BE ORDERED TO PRODUCE THE APPROPRIATE RECORDS TO ALLOW THE PENSION FUND TO AUDIT ITS PAYROLL BOOKS AND RELATED RECORDS AND DEFENDANTS MUST PAY ANY ADDITIONAL AMOUNTS FOUND TO BE DUE AND OWING**

The determination of an employee's eligibility for benefits is made based upon information contained in the remittance report, to be filed monthly by each and every signatory employer. A proper determination of eligibility is not possible if remittance reports are not submitted or if they contain incorrect information. See, 29 U.S.C. §1132(g)(2)(E) (equitable relief); Teamsters Local 639 – Employers Trust v. Jones & Artis Construction Co., 640 F. Supp.223 (D.D.C. 1986); IBPAT Union and Industry Pension Fund v. Hartline – Thomas, Inc., 4 EBC 1199, 1200 (D.D.C. 1983); Laborers' Fringe Benefit Pension Fund v. Northwest Concrete, 640 F. 2d 1350, 1352 (6th Cir. 1981).

In order to determine whether the contributing employer has made all required contributions and correctly reported hours worked and paid to its employees, the Pension Fund has the right to review all of the employer's records that relate to its contributory obligation. Central States, S.E. & S.W. Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559, 105 S.Ct. 2833 (1985). The employer has the obligation to maintain appropriate records and to permit the Pension Fund's auditors to review those records upon request. Michigan Laborers' Health Care Fund v. Grimaldi Concrete, Inc., 30 F.3d 692, 695 (6th Cir. 1994).

In the present case, the Labor Contracts and Trust Agreement obligate Defendants to allow the audit. See Exhibit 1, Montemore Declaration, ¶¶6-13; Exhibit 2, Labor Contracts; Complaint, Exhibit 1, Art. VI, Sec. 6. The scope of records subject to review is broad, and include those records the auditors reasonably deem necessary to conduct an audit. DeMarco v. C & L Masonry, 891 F.2d 1236 (6th Cir. 1989).    In addition to the routine payroll records (e.g.,

time cards, cancelled payroll checks, payroll ledgers and payroll tax returns), they can include the general check registers and cancelled checks, general disbursements ledgers and federal and state corporate income tax returns. Ibid.

An audit is necessary in this case in order to determine the exact amount due to the Pension Fund because of Defendants' failure to submit contractually-required remittance reports and furthermore, to ensure that the remittance reports submitted by Defendants are correct. See Exhibit 1, Montemore Declaration, at ¶¶12-13. The Company's obligations under the Agreement and 29 U.S.C. § 1145 mean nothing if the Pension Fund cannot ensure compliance through an audit. The Court should order Company to produce its records for an audit for all periods in which the Defendants are obligated to make contributions to the Pension Fund so that a precise determination of the amount owed can be made. Upon completion of the audit, the Court should enter a further judgment against Defendants for all additional amounts found to be due and owing under the Agreement and ERISA.

## CONCLUSION

Plaintiff, therefore, requests that the Court enter a judgment against Defendants, jointly and severally, in the amount of $29,954.95, which includes $3,977.24 in attorneys' fees and costs, order Defendants to submit the remittance reports and corresponding contributions together with interest and liquidated damages and order Company to produce its payroll books and related records for an audit for all periods in which the Company is obligated to make fringe benefit contributions to the Pension Fund.

In light of the clear statutory intent of ERISA, it is respectfully requested that this Court

grant the Pension Fund the relief requested in the Motion for Default Judgment.

Respectfully submitted,

JENNINGS SIGMOND, P.C.

  /s/ Sanford G. Rosenthal
SANFORD G. ROSENTHAL
Bar No. 478737
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0611/0660

Date: May 4, 2007

Attorneys for the Fund

OF COUNSEL:
JEROME A. FLANAGAN
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0660

## CERTIFICATE OF SERVICE

I, SANFORD G. ROSENTHAL, ESQUIRE, state, under penalty of perjury, that the foregoing Motion for Judgment by Default by the Court pursuant to Federal Rule of Civil Procedure 55(b)(2) against Defendants was served by mailing same first class mail, postage prepaid, on the date listed below to:

OXFORD PAINTING CO.
a/k/a Oxford Painting, Co.
615 Bundy Court
New Castle, IN 47362

And

TERRY S. CRAWFORD
615 Bundy Court
New Castle, IN 47362

s/ Sanford G. Rosenthal
SANFORD G. ROSENTHAL, ESQUIRE

Date: May 4, 2007

**THIS DOCUMENT HAS BEEN ELECTRONICALLY FILED AND IS AVAILABLE FOR VIEWING AND DOWNLOADING FROM THE ECF SYSTEM**

182452-1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND | ) ) ) | |
| Plaintiff | ) | CIVIL ACTION NO. |
| v. | ) | 1:07-CV-00387 |
| | ) | |
| OXFORD PAINTING CO. a/k/a Oxford Painting, Co. et al. | ) ) | |
| | ) | |
| Defendants | ) | |

## ORDER AND JUDGMENT BY DEFAULT AGAINST DEFENDANTS

Upon consideration of the Complaint and Plaintiff's Motion for Entry of Judgment by Default, the supporting Memorandum, declarations and attached Exhibits, it appears to the Court that Defendants were served with process and have inexcusably, knowingly and willfully failed to appear, plead or otherwise defend, and the default against said Defendants having been entered, the Court **FINDS:**

A.     Defendants, Oxford Painting Co. a/k/a Oxford Painting, Co. ("Company") and Terry S. Crawford ("Individual Defendant" and together with Company, "Defendants") are bound to collective bargaining agreements requiring them to remit fringe benefit contributions and other sums to Plaintiff.

B.     Defendants have failed to remit to Plaintiff the fringe benefit contributions and other sums required by the collective bargaining agreement.

C.     Individual Defendant guaranteed amounts due to the Plaintiff by the Company and since Company has failed to submit all monthly reports and payments, he is personally liable for all amounts due to Plaintiff.

182452-1

Consistent with these findings, it is **ORDERED**:

1.      Plaintiff's Motion is Granted.

2.      Pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure and 29 U.S.C.

§1132(g)(2)(A) through (E), judgment is entered in favor of Plaintiff, International Painters and

Allied Trades Industry Pension Fund ("Pension Fund" or "Plaintiff"), and against Defendants,

jointly and severally, in the amount of $29,954.95, which consists of the following:

        (a)      Unpaid contributions in the amount of $21,316.58 for the period October

2005 through December 2005, April 2006, August 2006 and November 2006 through March

2007;

        (b)      Liquidated damages in the amount of $4,263.32;

        (c)      Interest through April 30, 2007 in the amount of $397.81. The contribution

amount in Paragraph 2(a) shall continue to bear interest as provided in 29 U.S.C. §1132(g)(2)(B)

and 26 U.S.C. §6621, as from time to time amended, until the date of actual payment.

        (d)      $3,977.24, representing the attorneys' fees and costs incurred in the

collection and enforcement of this action through May 3, 2007, in accordance with 29 U.S.C.

§1132(g)(2)(D).

3.      Defendants, their owners, officers, agents, servants, attorneys and all other

persons acting on their behalf or in conjunction with them shall be and hereby are restrained and

enjoined from refusing to file complete, proper and timely remittance reports with the

accompanying contributions and dues for all periods Defendants are obligated to do so under the

collective bargaining agreement(s);

4.      Within ten (10) days of the entry of this Order, Defendants shall fully and

accurately complete and submit to the Plaintiff any and all outstanding remittance reports,

182452-1

including but not limited to reports and contributions for the period November 2006 through March 2007, together with a check for the full amount of the contributions and dues due, including interest and liquidated damages.

5.    Within twenty (20) days of a request by Plaintiff or its counsel, Defendants shall make available to the designated representative of the Plaintiff all payroll books and related records necessary for Plaintiff to ascertain the precise amount of any delinquent contributions due and owing to Plaintiff for all periods in which Defendants are obligated to make fringe benefit contributions to the Plaintiff and Defendants shall bear the costs of said audit.

6.    Plaintiff shall have the right to conduct future audits for all relevant periods, including the time periods covered by this judgment. Defendants shall be and hereby are restrained and enjoined from failing and refusing to submit to such audits by certified public accountants selected by Plaintiff and shall produce all payroll books and related records requested by Plaintiff, including, but not limited to, payroll, wages, general ledger and cash disbursement records, compensation insurance audits and by other pertinent records deemed necessary for the purpose of ascertaining and/or verifying payments and/or liabilities to Plaintiff. Defendants shall pay Plaintiff any additional amounts found owing, plus such other amounts as set forth in the Agreement, the Agreement and Declaration of Trust of the Pension Fund, the International Painters and Allied Trades Industry Pension Plan, ERISA or any other applicable law.

7.    If additional delinquencies are discovered pursuant to the submission of the remittance reports or to the audit referred to above, or as a result of additional information that becomes available to the Plaintiff, the Plaintiff may apply to the Court for an additional or supplemental judgment reflecting any additional delinquencies, interest, liquidated damages,

attorneys' fees and costs, pursuant to ERISA, 29 U.S.C. §1132(g)(2) together with any audit costs incurred by the Plaintiff.

8.    If any such further action by the Plaintiff is required, it may apply to this Court or to the court in which enforcement is sought, for such further reasonable attorneys' fees and costs in addition to those set out in Paragraph 2(d) above. See, Trucking Employees of North Jersey Welfare Fund, Inc. v. Bellezza Co., 57 Fed. Appx. 972 (3d Cir. 2003); International Painters and Allied Trades Industry Pension Fund v. H.W. Ellis Painting Co., Inc., No. 03-1125, slip. op. at *3 (D.D.C. February 10, 2004) (citing Free v. Briody, 793 F.2d 807 (7th Cir. 1986); Sheet Metal Workers Health and Welfare Trust Fund v. Big D Service Co., 867 F.2d 852 (10th Cir. 1989)).

9.    If Defendants fail to comply with any of the terms of this Order, the Plaintiff may, in addition to pursuing the remedies provided for under Federal Rule of Civil Procedure 69, reopen this case upon motion to the Court and notice to the Defendants, and may at that time ask for further appropriate monetary and/or injunctive relief.

BY THE COURT

Date:_____    By: _____
                                      Royce C. Lamberth,          J.
                                      United States District Judge

182452-1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL PAINTERS AND ALLIED )
TRADES INDUSTRY PENSION FUND )
                                  )
                     Plaintiff        )      CIVIL ACTION NO.
     v.                               )      1:07-CV-00387
                                    )
OXFORD PAINTING CO. )
      a/k/a Oxford Painting, Co. et al.   )
                                    )
                Defendants    )

## DECLARATION OF THOMAS MONTEMORE

THOMAS MONTEMORE states and declares the following:

1.     My name is Thomas C. Montemore and I am the Assistant to the Fund

Administrator of the International Painters and Allied Trades Union and Industry Pension Fund

("Pension Fund", "Fund" or "Plaintiff"). I have held that position since February 1, 2000. I

served as Delinquency Controller from 1988 through October 31, 2000 and I have served as the

Delinquency Coordinator from 1986 to 1988, and before that, acted as Agreement Clerk from

1982 to 1986, and File Clerk beginning in 1979.

2.     The Pension Fund is an "employee benefit pension plan" as defined in Section

3(2)(A)(i) of ERISA, as amended, 29 U.S.C. §1002(A)(i), established by the International Union

of Painters and Allied Trades, AFL-CIO-CFL ("Union"), and employers in private industry

whose employees are members of or otherwise represented by the Union and its district councils

and local unions, for the purpose of providing retirement income to the employees. The Pension

Fund is administered in the District of Columbia from its and my principal place of business at

1750 New York Avenue, N.W., Washington, D.C. 20006.



3.      I have personal knowledge of the contents of the collective bargaining

agreements, the Agreement and Declaration of Trust ("Trust Agreement") and the International

Painters and Allied Trades Industry Pension Plan ("Plan") referenced in this Motion.

4.      The Pension Fund, as part of its normal operating procedure, maintain files

containing copies of the collective bargaining agreements signed by each employer and copies of

the remittance reports submitted by each contributing employer. The Pension Fund also

maintains, as part of its normal operating procedures, a record of all contributions which are paid

to the Pension Fund by each contributing employer, including copies of checks submitted

directly from employers as payment for contributions due.

5.      Defendant, Oxford Painting Co. a/k/a Oxford Painting, Co. ("Company") is an

Indiana corporation located in New Castle, Indiana.  Terry S. Crawford ("Individual Defendant"

and together with Company, "Defendants") is the President of Company.  See Exhibit 3.   In

addition, Individual Defendant guaranteed the statutory and contractual liabilities of Company by

signing a Promissory Note ("Note") and Personal Guarantee ("Guarantee") on November 15,

2005.  True and correct copies of the Note and Guarantee are attached as Exhibit 3.

6.      Defendants are currently employers that are party to or bound by collective

bargaining agreements ("Labor Contracts") with the Union.  True and correct copies of relevant

provisions of the Labor Contracts are attached as Exhibit 2. Under the terms of the Labor

Contracts, Company is bound to the Trust Agreement and Plan. See, Exhibit 2(a), Labor

Contract, Art. XIII and Exhibit 2(b), Labor Contract, Art. VIII.

7.      The Labor Contracts require Company to submit monthly contributions to the

Pension Fund on behalf of all employees in the bargaining unit, and set forth the rate of

contribution and the method for calculating the total amount of contributions due the Pension

Fund. Contributions must be made for each hour for which employees receive pay at the contribution rate specified in the agreements. Failure to make the required contributions, or to submit either incorrect or late remittance reports and contributions, results in a delinquency to the Pension Fund.

8.      The Defendants previously incurred contribution delinquencies to the Fund.  In settlement of those delinquencies, the Defendants entered a settlement agreement with the Pension Fund on November 15, 2005 by signing a Promissory Note and Personal Guarantee ("November 15, 2005 Settlement") for the principal sum of $16,354.40.   See, Exhibit 3.  The Defendants' failure to timely remit either an installment under the November 15, 2005 Settlement or future fringe benefit contributions payments to the Pension Fund were among the grounds for default under the terms of the November 15, 2005 Settlement.  Individual Defendant personally guaranteed the settlement payments and Company's other contributory obligations. See Exhibit 3.  Defendants breached the terms of the November 15, 2005 Settlement by failing to make all of the required payments under the agreement to the Pension Fund.

9.      Based upon information currently available to the Pension Fund, Defendants presently owe the Pension Fund contributions for the period October 2005 through March 2007 in the amount of at least $21,316.58.   This amount includes an estimate for the period of November 2006 through March 2007, a period for which Defendant has failed to submit both contributions and remittance reports to the Pension Fund. For the period in which the Pension Fund has not received remittance reports and corresponding contributions, the Pension Fund is forced to estimate an amount due from Defendants. The estimate is reached by averaging the three months of contributions prior to the first month in which no report is received. Using this

methodology, the Pension Fund has calculated the amount due for each of the months in the period as follows:

(work performed by Company's employees in Local 47's jurisdiction):

| MONTH | AMOUNT |
|---|---|
| August 2006 | $ 1,936.00 |
| September 2006 | $ 2,110.00 |
| October 2006 | $ 1,952.00 |
| TOTAL | $ 5,998.00 |

$5,998.00 divided by three equals $1,999.34, which is used as the estimated contribution amount due for each of the five months in the period. $1,999.34 times five equals $9,996.70 which is used as the estimated contribution amount due to the Pension for the period of November 2006 through March 2007 for worked performed in the jurisdiction of Local 47.

(work performed by Company's employees in Local 669's jurisdiction):

| MONTH | AMOUNT |
|---|---|
| August 2006 | $ 2,683.22 |
| September 2006 | $ 1,522.12 |
| October 2006 | $ 1,741.22 |
| TOTAL | $ 5,946.56 |

$5,946.56 divided by three equals $1,982.19, which is used as the estimated contribution amount due for each of the five months in the period. $1,982.19 times five equals $9,910.95which is used as the estimated contribution amount due to the Pension for the period of November 2006 through March 2007 for worked performed in the jurisdiction of Local 669.

10.    Defendants owe interest through April 30, 2007 in the amount of $397.81 on the unpaid pension contributions. The interest has been calculated in accordance with the fluctuating IRS interest rate, as provided at section 10 of the Plan.

11.    Section 10 of the Plan parallels the ERISA statute, 29 U.S.C. § 1132(g)(2), and requires the assessment of liquidated damages against Defendants in an amount equal to the greater of the following: the amount of interest owed on the delinquent principal, or twenty percent (20%) of the delinquent principal. As noted above, the total interest owed through April 30, 2007 is $397.81. Twenty percent (20%) of Defendants' unpaid contributions and contributions paid past the due date total $4,263.32. Since the total amount of liquidated damages is greater than the interest amount, Defendants owe $4,263.32 in liquidated damages.

12.    The Pension Fund routinely audits employers to ensure all required contributions are being paid. It also audits employers in connection with delinquency collection lawsuits. An audit is the most accurate tool employed by the Pension Fund to ensure an employer's compliance with its statutory obligations. In performing these audits, the auditor reviews the payroll records of each employee who performs work of the type covered by the collective bargaining agreement. These records will include time cards, payroll ledgers, payroll summaries, time slips, or such other payroll records as the employer maintains which will indicate the number of hours that each individual employee worked and was paid for each week. The information gathered from these records is then compared to the wage information found on the employer's federal, state and municipal tax returns and on the W-2 statements provided to the employees. The auditor also reviews disbursement ledgers and check registers to identify potential wage payments to employees not made through the payroll system. Job/project contracts are reviewed to determine whether the work performed is within the scope of the

182501-1

5

collective bargaining agreement. After compiling the information gathered from the above records, a schedule of the contributions that should have been paid according to the contract is prepared. This schedule, which is broken down by month, is then compared to the actual contributions which the employer did submit to the Pension Fund, with any differences noted. Once completed, an audit report is forwarded to the employer for its review and payment.

13.     Despite a continuing contractual obligation to do so, Defendants have repeatedly failed to submit timely remittance reports and pension contributions. The Pension Fund and its Trustees are required to pay benefits to all properly eligible employees of contributing employers. Employees of contributing employers continue to accrue pension credits, based on the hours of their employment, regardless of whether their employers make pension contributions on their behalf for these hours, as contractually required. The Pension Fund's obligation to recognize pension credits and to pay pensions to vested employees is absolute and continues even if the employers fail to pay their required pension contributions. Employer contributions <u>and</u> the earnings the Pension Fund receives by investing these contributions comprise the assets from which the Pension Fund pays retirement benefits to participants and their dependents and beneficiaries. When employers, like Defendants, fail to pay their contributions or do not pay them timely, the Pension Fund is deprived of the investment income they otherwise could have earned. In addition, the Pension Fund also must engage in time-consuming and costly efforts to collect the unpaid contributions. These efforts include letters and phone calls to the employer, investigating other sources for collection and attempting to calculate delinquency amounts and benefit eligibility through other sources (e.g. paystubs), if available. Further, the Pension Fund has to process benefit eligibility and benefit claims manually so that participants (and their dependents) employed by the delinquent employer are not deprived of

182501-1

6

retirement benefits. The actual losses and added costs (in terms of dollar amount, capital and manpower) incurred by the Pension Fund in connection with an employer contribution delinquency are not capable of precise determination, but they are substantial. Defendants' refusal to contribute as it is bound means irreparable harm and injury to the Pension Fund – an obligation to make benefit payments to employees without necessary contributions from Defendants to cover those benefits. Therefore, Defendants should be required to submit timely current contributions and remittance reports in the future.

      14.    I have executed this Declaration in support of Plaintiff's Motion for Default Judgment against Defendants and request that this Court consider the same as proof in support of the allegations contained in the Plaintiff's Complaint and other facts stated in this Declaration.

Pursuant to 28 U.S.C. §1746, I declare under Penalty of perjury that the foregoing is true and correct.

Executed on: _5/2/07_

THOMAS MONTEMORE

RECEIVED

JUL 1 9 2004

G.S.T.

# COLLECTIVE BARGAINING AGREEMENT

### between

## SIGNATORY PAINTING AND DRYWALL FINISHING CONTRACTORS OF INDIANAPOLIS AND VICINITY and the WALL AND CEILING CONTRACTORS ASSOCIATION, INC.

### and the

## INTERNATIONAL UNION of PAINTERS AND ALLIED TRADES, LOCAL UNION 47
### 6501 MASSACHUSSETTS AVENUE
### INDINAPOLIS, INDIANA  46226
### phone   317-546-5638     fax  317-546-5903



### affiliated with

# DISTRICT COUNCIL 91
## INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES
## AFL-CIO, CLC
## 409 MILLNER INDUSTRIAL DRIVE
## EVANSVILLE, INDIANA  47710
### phone   812-962-9191     fax  812-425-4890



RECEIVED

JUL 2 1 2004

IUPAT PENSION FUND



EXHIBIT

2 (a)

# ARTICLES OF AGREEMENT

This Agreement, entered into and becoming effective this 1st day of June 2004 until May 31, 2009, by and between **SIGNATORY PAINTING AND DRYWALL FINISHING CONTRACTORS OF INDIANAPOLIS AND VICINITY and the WALL & CEILING CONTRACTORS ASSOCIATION, INC.** (hereinafter referred to as the Employer) and **THE INTERNATIONAL UNION of PAINTERS and ALLIED TRADES LOCAL UNION 47, affiliated with DISTRICT COUNCIL 91** (hereinafter referred to as the Union).

**Witnesseth that:**

**Whereas,** the Union is recognized as the collective bargaining representative for all Local Union 47 members employed by the Employer in the jurisdictional area of Local Union 47 (subject to Article 1, Section 3);

**Whereas,** the parties have had negotiations concerning the wages, fringe benefits, terms and conditions of employment and arrived at an Agreement thereon;

**Now, therefore,** in consideration of the mutual promises and undertakings herein contained, it is agreed by and between the parties hereto that the following shall constitute and be the entire Agreement between the parties hereto in respect to rates of pay, fringe benefits, hours of work and other conditions of employment for and during the term of this Agreement.

## ARTICLE I
## RECOGNITION AND UNION SECURITY

**Section 1.**   Employers signatory to this Agreement recognize District Council 91 and its affiliated Local Union 47 as the exclusive bargaining representative of all of the employees covered by this Agreement under the jurisdiction of IUPAT District Council 91's Local Union 47 for purposes of collective bargaining with respect to rates of pay, fringe benefits, hours of work and other conditions of employment.

**Section 2.**   IUPAT District Council 91's Local Union 47 hereby recognizes the Employer, Owner or designated Officer of the company or corporation as identified on the Memorandum of Agreement as their individual collective bargaining representative.

**Section 3.**   All employees who are members of the Union on the effective date of this Agreement or on the date of execution of the Agreement, whichever is later, shall remain members of the Union in good standing as a condition of employment. All present employees who are not members of the Union and all employees who are hired hereafter, shall make application to become members and upon completion of the entrance exam, and if accepted shall remain members in good standing of the Union as

a condition of employment on or after the 8th day following the beginning of their employment or on and after the 8th day following the effective date of this Agreement, whichever is later.  The Employer will notify the Union within one (1) day of all new hires.

**Section 4.    50/50**    The Contractor or the Employer party to this Agreement, when engaged in work outside the geographical jurisdiction of the Union party to the agreement, shall employ not less that fifty percent (50%) of the workers employed on such work from among the residents of the area where the work is performed or from among persons who are employed the greater percentage of their time in such area any others shall be employed from the Contractor's home area.

**Section 5.    Out of Area**    The Employer party hereto shall, when engaged in work outside the geographic jurisdiction of the Union party to the Agreement, comply with all of the lawful clauses of the Collective Bargaining Agreement in effect in said other geographic jurisdiction and executed by the Employers of the industry and the affiliated Local Unions in that jurisdiction, including but not limited to, the wages, hours, working conditions, fringe benefits and procedure for settlement of grievances set forth therein provided however, that as to employees employed by such Employer from within the geographic jurisdiction of the Union party to this Agreement and who are brought into an outside jurisdiction, such employees shall be entitled to receive the wages and conditions effective in either the home or outside jurisdiction, whichever are more favorable to such employees, and fringe benefit contributions on behalf of such employees shall be made solely to their home funds in accordance with their governing documents.  This provision is enforceable by the Local Union or District Council in whose jurisdiction the work is being performed, both through the procedure for settlement of grievances set forth in its applicable Collective Bargaining Agreement and through the courts, and is also enforceable by the Union party to this Agreement both through the procedure for settlement of grievances set forth in this Agreement and through the courts.

**Section 6.    Preservation of Work**    To protect and preserve, for Employees covered by this Agreement all work they have performed and all work covered by this Agreement and to prevent any device or subterfuge to avoid the protection and preservation of such work, it is agreed as follows:  If the Employer performs on-site construction work of the type covered by this Agreement, under its own name or the name of another, as a corporation, company, partnership, or other business entity, including a joint venture, wherein the Employer, through its officers, directors, partners, owners, or stockholders, exercises directly or indirectly (through family members or otherwise), management, control, or majority ownership, the terms and conditions of this Agreement shall be applicable to all such work.

**(a).**   All charges of violations of Section 1 of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement on the handling of grievances and the final and binding resolution of disputes.  As a remedy for violations of this Article, the Joint Trade Board or Arbitrator shall be able, at the request of the Union, to require an Employer to pay:

**(1).**   To affected employees covered by this Agreement, including registered applicants for employment the equivalent of wages those Employees have lost because of the violations, and

**(2).**   Into the affected Joint Trust Funds to which this Agreement requires contributions, any delinquent contributions that resulted from the violations.  The Joint Trade Board or Arbitrator shall be able also to provide any other appropriate remedies, whether provided by law or this Agreement.  The Union shall enforce a decision of the Joint Trade Board or Arbitrator under this Article only through arbitral, judicial, or governmental (for example, the National Labor Relations Board) channels.

**(b).**   If, after an Employer has violated this Article, the Union and/or the Trustees of one or more Joint Trust Funds to which this Agreement requires contributions institute legal action to enforce an award by the Arbitrator or the Joint Trade Board remedying such violation, or defend an action that seeks to vacate such award, the Employer shall pay any accountants' and/or attorneys' fees incurred by the Union and/or the Joint Trust Funds, plus costs of the litigation, that have resulted from such legal action.  This Section does not affect other remedies, whether provided by law or this Agreement that may be available to the Union and/or the Joint Trust Funds.

**Section 7.**   **Respect for Primary Activity**   Employees covered by this Agreement shall have the right to respect any legal primary picket line validly established by any bona fide labor organization, and the Union party to this Agreement has the right to withdraw employees covered by this Agreement whenever the Employer party to the Agreement is involved in a legitimate primary labor dispute with any bona fide labor organization.

## ARTICLE II
## DEFINITIONS

**Section 1.**    An Employer is hereby defined to be an individual, partnership, company or corporation, who does work direct with an owner, owner's agent, architect and/or builder and who employs union employees in the application of paints, coatings, wall coverings, drywall finishing materials and other related operations and who owns and possesses the tools and equipment necessary to operate such business.

**Section 2.**    An employee is hereby defined to be all employees covered by this Agreement who have successfully completed an application to become a member of the Union, or who are already members of the Union, as described in Article 1, Section 3.

**Section 3.**    No Employer shall subcontract jobs to any member of Local Union 47 or non-union contractors.  No employee covered under this Agreement has the right to bid or figure any work against any signatory Employer.

## ARTICLE III
## DUES CHECK-OFF PROVISION

**Section 1.**    Every Employer signatory to this Agreement hereby agrees to check-off from the wages of any employee employed by such Employer during the term of this Agreement, administrative dues in the amount specified in the Union's by-laws and to remit said amount to the Union in the following manner:

**(a).**    The Union will notify the Employer in writing of the amount of administrative dues specified in the by-laws, and will submit to the Employer a copy of the by-laws or the applicable by-law provision.

**(b).**    For each payroll period, the Employer will deduct from the wages of each employee the amount specified in the by-laws based on the number of hours worked during said payroll period, and will accumulate said deductions to the end of the month.

**(c).**    Each month, the Employer will remit to the Union the entire amount of administrative dues due and owing as to each employee for the month previous, together with a list of employees covered hereby and the number of hours worked by each during the applicable period.

**Section 2.**    When a signatory Employer performs a job within the jurisdiction of a union affiliated with the International Union of Painters and Allied Trades other than the union signatory hereto and the by-laws of that other union contain a provision for administrative dues or business representative "assessment", the Employer shall check-off from the wages of employees covered by this Agreement and employed on

that job, administrative dues or business representative "assessment" in the amount stated in that other union's by-laws, and shall remit said amount to that other union. In that event, that other union shall be acting as agent of the signatory union for the purpose of policing and administering this Agreement. In performing the check-off, the procedure specified in Section 1(a through c) will be followed, except that it shall be the responsibility of said other union to notify the Employer in writing of the amount of administrative dues or business representative "assessment" specified in its by-laws and to submit to the Employer an copy of the by-laws or the applicable by-law provision. When the signatory Employer performs a job within the jurisdiction of a union affiliated with the Union of Painters other than the union signatory hereto, and the by-laws of that other union contains no provision for administrative dues or business representative "assessment", the Employer shall continue to be bound by Section 1.

**Section 3.**    The obligations of the Employer under Sections 1 and 2 shall apply only as to employees who have voluntarily signed a valid "Dues Deduction Authorization Card".

**Section 4.**    At the time of the employment of any employee, the Employer will submit to each such employee for his voluntary signature a "Dues Deduction Authorization Card" in triplicate, one (1) copy of which is retained by the Employer, one (1) copy retained by the employee, and the other returned to the Union, the form to be supplied such Employer by the Union.

**Section 5.**    For the purpose of this Article, the date that the dues check-off is due and the penalty for non payment in a timely manner shall be the same due date and the same penalty as the Health and Welfare Fund's due date and penalty.

## ARTICLE IV
## WORK COVERED

**Section 1.**    The Employer recognizes, acknowledges, and agrees that Local Union 47 of District Council 91 is the exclusive representative for the purpose of collective bargaining, of all the Employer's employees wherever such employees may be employed, in the following classifications of work:  All painting, decorating, drywall finishing, paper hanging, hardwood and furniture finishing, waxing, oiling, staining, or the removal of all such finishes or materials from any and all surfaces, including, intumescent fire retardant coatings also all mold and mildew remediation, lead abatement and application of all asbestos encapsulation.  Also, all preparatory work incidental to the painting or decorating of any surfaces and, wherever possible, washing or cleaning of all painted or decorated surfaces with liquid, steam, sandblast, water blast, or other method.  Also wherever possible, the cleaning up of painters waste materials and spills, and such other work as may be designated as "painters" in the latest issue of the General Constitution of the International Union of Painters and Allied Trades under the caption "Jurisdiction: and the Book of Awards."  Also the operation

and care of all tools and equipment used to perform said work, including, but not limited to, brushes, rollers, spray painting equipment, sandblasting equipment, miscellaneous hand and power tools, ladders, scaffolding and other rigging and similar or related classification of work.

**Section 2.**   It shall be incumbent upon every Contractor signatory to this Agreement to exert every effort to accomplish all work falling under the jurisdiction of paint contracting, including the taping and finishing of drywall construction, the finishing of floors, and the installing of epoxy floor coverings or painted floor coverings.

## ARTICLE V
## TERRITORIAL JURISDICTION

The territorial jurisdictional area of Local Union 47, a fully affiliated Local Union of District Council 91, shall be the designated geographical boundaries as determined by General Executive Board of the International Union of Painters and Allied Trades. Painters Local Union No. 47 has territorial jurisdiction over the following Counties: Bartholomew, Boone, Brown, Decatur, Hamilton, Hancock, Hendricks, Jackson, Jennings, Johnson, Lawrence, Marion, Martin, Monroe, Morgan, Orange and Shelby.

## ARTICLE VI
## HOURS OF WORK, RATES OF PAY, OVERTIME

**Section 1.    Hours of Work**    The basic work day shall consist of no more than eight (8) hours, commencing as early as 6 a.m. and ending no later than 6 p.m. The basic work week shall consist of forty (40) hours, Monday through Friday. Saturday will be considered a make up day where work is missed due to inclement weather or other situations beyond the Employer's control upon mutual agreement between the Employer and employee. Night shift or special shift work consists of all work which begins on or after 3 p.m. Under no circumstances will the above be used to circumvent the time and one half provisions of this Agreement. A ten (10) hour, four (4) day work week will be allowed, Monday through Friday, through mutual agreement between the Employer and the Union Business Representative.

**Section 2.    Overtime Payments**    All hours in excess of the regular work day and work week shall be considered overtime. Overtime on days recognized as regular work days shall be paid for at the rate of time and one-half of the regular rate. Saturday and Sunday are overtime days (except as provided for in Article VI, Section 1) and the rate of pay is one and one half (1 ½) times the regular hourly rate.

**Section 3.**    **Required Training**          To be eligible for wage increases, all Local #47 Journeymen must have successively completed their: OSHA 10 Hour Hazard Awareness Training, Red Cross First-Aid/CPR Training, Scaffolding Training, Boom and Scissors Lift Training, at least one (1) elective and the following training:

OSHA 30 Hour Hazard Awareness by...............................................5/31/05
Insurance Understanding Program and Red Cross First-Aid/CPR by ......5/31/06
Drug and Alcohol Awareness Program by.........................................5/31/07
Additional Elective offered by the JATC by.........…...….........................5/31/08
Additional Elective offered by the JATC by.........…................................5/31/09

Members who do not complete their training during the required time period will be eligible for their wage increase after successful completion of their training, however eligibility for their wage increase will not take effect until the beginning of the quarter following the quarter in which their training was completed. Beginning quarter dates for wage eligibility are: January 1st, April 1st, July 1st, and October 1st.

## Section 4.    Hourly Wage Rates

## (a).    Commercial, Industrial Painting and Drywall Finishing

### JUNE 1, 2004 TO MAY 31, 2005

| JOB CLASSIFICATION | BASE WAGE | H & W FUND | PENSION FUND | TRAINING, NJATF, & LMCI FUNDS | DRUG & ALCOHOL | TOTAL |
|---|---|---|---|---|---|---|
| Brush, Roller, Drywall Finishers, Wall Covering Applicators | $21.59 | $4.96 | $3.81 | $.26 | $.07 | $30.69 |
| Use of Drywall Finishing Applicators (Ames, Tape-Tech, Premier) | $22.59 | $4.96 | $3.81 | $.26 | $.07 | $31.69 |
| Spray, Water Blast, Sand Blast | $22.59 | $4.96 | $3.81 | $.26 | $.07 | $31.69 |

### JUNE 1, 2005 TO MAY 31, 2006*

| JOB CLASSIFICATION | BASE WAGE | H & W FUND | PENSION FUND | TRAINING, NJATF, & LMCI FUNDS | DRUG & ALCOHOL | TOTAL |
|---|---|---|---|---|---|---|
| Brush, Roller, Drywall Finishers, Wall Covering Applicators | | | | | $.07 | $31.69 |
| Use of Drywall Finishing Applicators (Ames, Tape-Tech, Premier) | | | | | $.07 | $32.69 |
| Spray, Water Blast, Sand Blast | | | | | $.07 | $32.69 |

*The negotiated increase for June 1, 2005 to May 31, 2006 is a total of $1.00.  The membership of Local Union 47 reserves the right to apply the increase to wages and/or fringes as needed.

June 1, 2006 to May 31, 2007**

| JOB CLASSIFICATION | BASE WAGE | H &W FUND | PENSION FUND | TRAINING, NJATF, LMCI FUNDS | DRUG & ALCOHOL | TOTAL |
|---|---|---|---|---|---|---|
| Brush, Roller, Drywall Finishers, Wall Covering Applicators | | | | | $.07 | $32.69 |
| Use of Drywall Finishing Applicators (Ames, Tape-Tech, Premier | | | | | $.07 | $33.69 |
| Spray, Water Blast, Sand Blast | | | | | $.07 | $33.69 |

**The negotiated increase for June 1, 2006 to May 31, 2007 is a total of $1.00.  The membership of Local Union 47 reserves the right to apply the increase to wages and/or fringes as needed.

JUNE 1, 2007 TO MAY 31, 2008***

| JOB CLASSIFICATION | BASE WAGE | H & W FUND | PENSION FUND | TRAINING, NJATF, & LMCI FUNDS | DRUG & ALCOHOL | TOTAL |
|---|---|---|---|---|---|---|
| Brush, Roller, Drywall Finishers, Wall Covering Applicators | | | | | $.07 | $33.69 |
| Use of Drywall Finishing Applicators (Ames, Tape-Tech, Premier) | | | | | $.07 | $34.69 |
| Spray, Water Blast, Sand Blast | | | | | $.07 | $34.69 |

***The negotiated increase for June 1, 2007 to May 31, 2008 is a total of $1.00.  The membership of Local Union 47 reserves the right to apply the increase to wages and/or fringes as needed.

June 1, 2008 to May 31, 2009****

| JOB CLASSIFICATION | BASE WAGE | H &W FUND | PENSION FUND | TRAINING, NJATF, & LMCI FUNDS | DRUG & ALCOHOL | TOTAL |
|---|---|---|---|---|---|---|
| Brush, Roller, Drywall Finishers, Wall Covering Applicators | | | | | $.07 | $34.69 |
| Use of Drywall Finishing Applicators (Ames, Tape-Tech, Premier | | | | | $.07 | $35.69 |
| Spray, Water Blast, Sand Blast | | | | | $.07 | $35.69 |

****The negotiated increase for June 1, 2008 to May 31, 2009 is a total of $1.00. The membership of Local Union 47 reserves the right to apply the increase to wages and/or fringes as needed.

**(b).**    **Night Work Wages**    Job classification rate plus $1.00 an hour.

**(c).**    **Foreman Wages**    Any foreman in charge of a shop or job shall receive one dollar ($1.00) per hour above the job classification rate. Foremen on jobs with more than 10 employees will be compensated at a rate of 10% above the basic rate.

**(d)**    **High Pay**    Hourly rates for suspended scaffold and for open steel (Structures with no, or uncompleted roof or walls), height above fifty (50) feet is the regular wage rate for the work performed, plus one dollar ($1.00) for each hour worked. An additional twenty-five cents ($.25) per hour for every additional fifty (50) feet in elevation will be added to the fifty (50) foot rate.

**(e).**    **Travel Pay**    There is to be no travel pay within the following Indiana Counties:  Boone, Hamilton, Hancock, Hendricks, Johnson, Marion, Madison (in Madison County areas North of State Road 128 will be subject to travel pay), Morgan and Shelby.  Travel pay starts after an employee leaves the previously mentioned Counties (and when traveling North of State Road 128 in Madison County), at the following rates per mile in both directions.

   June 1, 2004 - May 31, 2005............24 cents per mile
   June 1, 2005 - May 31, 2006...........28 cents per mile
   June 1, 2006 - May 31, 2007...........32 cents per mile
   June 1, 2007 - May 31, 2008...........36 cents per mile
   June 1, 2008 - May 31, 2009...........40 cents per mile

Mileage will be based on the use of the most efficient route of getting to the job.  At no time will the travel pay schedule exceed the allowable IRS mileage rate.  If an employee drives a company supplied vehicle, they are also not eligible for travel pay.  If an employee rides in an Employer provided vehicle, they are also not eligible for travel pay.

Travel pay is only available to the driver if two (2) or more employees ride together in a privately owned vehicle. In addition, employees who live and work in a travel pay County will not be eligible for travel pay.

Employees remaining out of town on work shall receive a mutually agreed amount equal to room and board.

<u>Section 5.</u>　　　**Road and Bridge Worker Job Classifications and Rates**

### JUNE 1, 2004 TO MAY 31, 2005

| JOB CLASSIFICATION | BASE WAGE | H & W FUND | PENSION FUND | TRAINING, NJATF, & LMCI FUNDS | DRUG & ALCOHOL | TOTAL |
|---|---|---|---|---|---|---|
| Group I | $25.70 | $4.96 | $3.81 | $.26 | $.07 | $34.80 |
| Group II | $24.10 | $4.96 | $3.81 | $.26 | $.07 | $33.20 |
| Group III | $14.05 | $4.96 | $3.81 | $.26 | $.07 | $23.15 |

### JUNE 1, 2005 TO MAY 31, 2006*

| JOB CLASSIFICATION | BASE WAGE | H & W FUND | PENSION FUND | TRAINING, NJATF, & LMCI FUNDS | DRUG & ALCOHOL | TOTAL |
|---|---|---|---|---|---|---|
| Group I | | | | | $.07 | $35.80 |
| Group II | | | | | $.07 | $33.60 |
| Group III | | | | | $.07 | $23.40 |

*The negotiated increase for June 1, 2005 to May 31, 2006 is a total of $1.00 for Group I, $0.40 for Group II and $0.25 for Group III. The membership of Local Union 47 reserves the right to apply the increase to wages and/or fringes as needed.

### June 1, 2006 to May 31, 2007**

| JOB CLASSIFICATION | BASE WAGE | H &W FUND | PENSION FUND | TRAINING, NJATF, & LMCI FUNDS | DRUG & ALCOHOL | TOTAL |
|---|---|---|---|---|---|---|
| Group I | | | | | $.07 | $36.80 |
| Group II | | | | | $.07 | $34.00 |
| Group III | | | | | $.07 | $23.65 |

**The negotiated increase for June 1, 2006 to May 31, 2007 is a total of $1.00 for Group I, $0.40 for Group II and $0.25 for Group III. The membership of Local Union 47 reserves the right to apply the increase to wages and/or fringes as needed.

### JUNE 1, 2007 TO MAY 31, 2008***

| JOB CLASSIFICATION | BASE WAGE | H & W FUND | PENSION FUND | TRAINING, NJATF, & LMCI FUNDS | DRUG & ALCOHOL | TOTAL |
|---|---|---|---|---|---|---|
| Group I | | | | | $.07 | $37.80 |
| Group II | | | | | $.07 | $34.40 |
| Group III | | | | | $.07 | $23.90 |

***The negotiated increase for June 1, 2007 to May 31, 2008 is a total of $1.00 for Group I, $0.40 for Group II and $0.25 for Group III. The membership of Local Union 47 reserves the right to apply the increase to wages and/or fringes as needed.

**June 1, 2008 to May 31, 2009\*\*\*\***

| JOB CLASSIFICATION | BASE WAGE | H &W FUND | PENSION FUND | TRAINING, NJATF, & LMCI FUNDS | DRUG & ALCOHOL | TOTAL |
|---|---|---|---|---|---|---|
| Group I | | | | | $.07 | $38.80 |
| Group II | | | | | $.07 | $34.80 |
| Group III | | | | | $.07 | $24.15 |

\*\*\*\*The negotiated increase for June 1, 2008 to May 31, 2009 is a total of $1.00 for Group I, $0.40 for Group II and $0.25 for Group III. The membership of Local Union 47 reserves the right to apply the increase to wages and/or fringes as needed.

**Group I:**     <u>New or Existing Structural Steel:</u>

Rigger, sandblaster, water blaster, lead based paint abatement and applicators of paints, epoxies, and urethane coatings by spray, brush or roller and the operation of trucks, air compressors and equipment.

**Group II:**     <u>New or Existing Concrete and Masonry Surfaces:</u>

Sandblaster, applicator of paints, epoxies, surface seals and masonry coatings by spray, brush or roller and the operation of trucks, air compressors and equipment.

**Group III:**     <u>Groundmen/Equipment Tenders on New and Existing Structural Steel, Concrete and Masonry Surfaces:</u>

Tenders of sand pots, paint spray equipment, water blast pumps, handlers of pollution control containment and coverings, traffic control, handlers of sand and paint materials, and the clean up of materials and debris during painting operations.

## ARTICLE VII
## PAYDAY

**Section 1.**    Payday is weekly and not more than five (5) days pay shall be withheld Monday through Friday of each week.

**Section 2.**    Employees shall have cash or checks in their hands not later than quitting time on the day traditionally set or prearranged as payday by that specific Employer. The above shall also include a statement of gross earnings and any deductions legally made. Such statement shall show the employee's name, the hourly rate of pay, the hours worked, all deductions made, the net amount due the employee, and the week ending date.

**Section 3.**    In the event the Pension or Health and Welfare Funds shall be legally dissolved per the Trust Agreements, all contributions designated to said plans shall automatically become wages and be added to the current basic rate.

**Section 4.**    Time cards, when used for records or other reason, are the responsibility of the employee. Time cards must be properly filled out in ink, signed by the employee, listing hours worked, rate of pay, and any subsistence due.

**Section 5.**    In the event that the Employer fails to pay wages in full to each employee on the traditional or customary payday, the employees and/or the Union may immediately commence a work stoppage and continue said stoppage until such time as the wages are paid in full to each employee.

## ARTICLE VIII
## HOLIDAYS

**Section 1.**    There shall be seven (7) recognized holidays consisting of: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the Friday after Thanksgiving, and Christmas Day. Any of the foregoing holidays falling on a Sunday shall be observed on the following Monday. Any work performed on any such holiday shall be paid at the double time rate.

**Section 2.**    No work shall be performed on Labor Day except in the case of emergency, to protect lives or property, and then only after permission has been granted by the Indianapolis Painters Joint Trade Board.

## ARTICLE IX
## WORKING STANDARDS

**Section 1.**      All working Employers must employ at least one (1) journeyman before being allowed to work with the tools.  This applies to contracting union members who are signatory to this Agreement.

**Section 2.**      Hand tools for specific types of work are hereby defined as tools furnished by the employee:

**(a).   Painters:**    Duster, Putty Knife, Scraper, Screwdriver, Wire Brush, Spinner and Caulking Gun.

**(b).   Wall Coverers:**    Tape Measure, Level, Tool Apron, Razor, Blade Holder, Seam Roller, Straight Edge and Broad Knife.

**(c).   Drywall Finishers:**      Pan and Taping Knives.

**Section 3.**      Employers shall furnish all wall covering tools, except hand tools. Employers shall furnish all drywall finishing applicators (Ames, Tape Tech, Premier, Banjo, Stilts etc.)

**Section 4.**      In no event shall laborers be used in painters' preparatory work.

**Section 5.**      Employees shall furnish and maintain clean "whites" at all times.

**Section 6.**      There shall be no tool restrictions written or implied.

## ARTICLE X
## APPRENTICES

**Section 1.**      The Indianapolis Painters Joint Apprenticeship and Training Committee (JATC) is responsible for the administration and operation of all training programs for the employees of this Agreement.  The administration and operation of the Indianapolis Painters JATC programs will at all times be in compliance with Training Standards that have the approval of the United States Department of Labor and the Bureau of Apprenticeship Training.

**Section 2**.    No contractor signatory to this Agreement may employ an apprentice except through the Indianapolis Painters JATC.  Each apprentice must be registered as per the apprenticeship standards as approved by the Indianapolis Painters JATC.

**Section 3**.    Every apprentice shall work under the supervision of a journeyman painter or drywall finisher.

**Section 4.**    The length of the probationary period shall be ninety (90) days, with Health and Welfare benefits commencing after the third (3rd) month on the job.

**Section 5.**    One (1) apprentice shall be allowed for each contractor shop with one (1) additional apprentice allowed for each two (2) journeyman employees.

**Section 6.**    As a condition of continued employment, all apprentices shall be required to attend the Apprenticeship School as scheduled by the Indianapolis Painters JATC.

**Section 7.**    The regular wage rate for apprentices shall be based on a percentage of the regular wage rate for a journeyman according to the following schedule:

## APPRENTICE WAGE AND BENEFIT SCHEDULE

Probationary                    40% of journeyman rate for 90 calendar days
                                and 100% of Training, no other benefits.

First year, first semester      50% of journeyman rate plus 100% of health, training
                                and 50% of journeyman pension contribution.
                (must have completed 90 day probationary period) $1.91

First year, second semester     55% of journeyman rate plus 100% of health, training
                                and 50% of journeyman pension contribution.
        (must have completed 72 school hours and 750 On the Job Training hours) $1.91

Second year, third semester     60% of journeyman rate plus 100% of health, training
                                and 60% of journeyman pension contribution.
            (must have completed 144 school hours and 1500 OJT hours) $2.29

Second year, fourth semester    65% of journeyman rate plus 100% of health, training
                                and 60% of journeyman pension contribution.
                (must have completed 216 school hours and 2250 OJT hours) $2.29

Third year, fifth semester        70% of journeyman rate plus 100% of health, training
                                  and 70% of journeyman pension contribution.
                                  (must have completed 288 school hours and 3000 OJT hours)    *$2.67*

Third year, sixth semester        75% of journeyman rate plus 100% of health, training
                                  and 70% of journeyman pension contribution.
                                  (must have completed 360 school hours and 3750 OJT hours)    *$2.67*

Fourth year, seventh semester     80% of journeyman rate plus 100% of health, training
                                  and 80% journeyman pension contribution.
                                  (must have completed 432 school hours and 4500 OJT hours)    *$3.05*

Fourth year, eighth semester      85% of journeyman rate plus 100% of health, training
                                  and 80% of journeyman pension contribution.
                                  (must have completed 504 school hours and 5250 OJT hours)    *$3.05*

100% journeyman status            576 school hours and 6000 OJT hours must be
                                  completed.

## ARTICLE XI
## TRAINING FUND

## Section 1.

(a).    For each hour or portion thereof, for which an employee, including probationary apprentices, receives pay, all signatory Employers shall make a payment in the amount indicated in ARTICLE VI, Sections 4(a) and 5, under the column TRAINING, NJATF & LMCI, to the Indianapolis Painters JATC Training Fund. During the term of this Agreement, the Trustees of the Indianapolis Painters JATC Training Fund will have the authority to increase the contribution rate paid by Employers, up to six cents ($.06) an hour if necessary, in order to meet the training obligations of the Fund.

(b).    For the purpose of this Article, each hour paid for, including hours attributable to show up time and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

(c).    Contributions shall be paid on behalf of any employee including probationary apprentices starting with the first day of employment during this Agreement.

**(d).**    Payments to the Training Fund required above shall be made to the Indianapolis Painters JATC as established under this Agreement and the Indianapolis Painters JATC Declaration of Trust and its successors.

**(e).**    From the Funds collected on behalf of the Training Fund, the Trustees of the Indianapolis Painters JATC shall hold in trust the sum of ten cents ($.10) per hour for each hour or portion thereof for which an employee receives pay. From the ten cents ($.10) per hour held in trust, the Indianapolis Painters JATC will remit five cents ($.05) per hour worked or portion thereof, to the International Union of Painters and Allied Trades National Joint Apprenticeship and Training Fund (IUPAT NJATF) and remit five cents ($.05) per hour worked or portion thereof, to the International Union of Painters and Allied Trades Labor Management Cooperation Initiative (IUPAT LMCI). During the term of this Agreement the Trustees of the Indianapolis Painters Joint Apprenticeship and Training Fund are authorized to increase Employer contributions to the Training Fund.

**(f).**    The Employer hereby irrevocably designates as its representatives on the IUPAT NJATF or the IUPAT LMCI such Trustees as are now serving or who will in the future serve, as Employer Trustees, together with their successors.

**(g).**    The Union hereby irrevocably designates as its representatives on the IUPAT NJATF or the IUPAT LMCI such Trustees as are now serving, or who will in the future serve, as union Trustees, together with their successors.

**(h).**    All contributions shall be made at such times and in such manner as the Trustees require, and the Trustees shall have the authority to have an independent Certified Accountant audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the Training Fund.

**(i).**    If an Employer fails to make contributions to the Indianapolis Painters JATC Training Fund within twenty (20) days after the date required by the Trustees, such failure shall be deemed a violation of this Agreement, and the Indianapolis Painters JATC shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereto to the contrary notwithstanding, and the Employer shall be liable for all costs of collecting the payments due together with attorney's fees and such penalties as may be assessed by the Trustees.

**(j)**    The Apprenticeship Plan adopted by the Trustees of said Apprenticeship Funds shall at all times conform with the requirements of said Internal Revenue Code and other applicable laws and regulations so as to enable the Employer at all times to treat contributions to the Apprenticeship Fund as a deduction for income tax purposes.

## ARTICLE XII
## PAINTERS AND ALLIED TRADES INTERNATIONAL
## UNION AND INDUSTRY PENSION

The only agreement between the Employer(s) and the Union parties to this Agreement regarding pensions or retirement for employees covered by this Agreement is as follows:

**Section 1.**    Commencing with the first day of January 2002, and for the duration of the Agreement, and any renewals or extension thereof, the Employer agrees to make payments to the PAT International Union and Industry Pension Fund for each employee covered by this Agreement, as follows:

**(a).**    For each hour or portion thereof for which an employee receives pay, the Employer shall make a contribution in the amount indicated in ARTICLE VI, Sections 4(a) and 5, under the column Pension, to the above named pension fund.

**(b).**    For the purpose of this Article, each hour paid for, including hours attributable to show-up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

**(c).**    Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, apprentices, helpers, trainees, and probationary employees. However no contributions will be made on probationary apprentices for the first ninety (90) days of employment. The contribution rates for apprentices past their probationary period will be as determined in ARTICLE X, Section 7-APPRENTICE WAGE AND BENEFIT SCHEDULE.

**(d).**    The payments to the Pension Fund required above shall be made to the IUPAT Industry Pension Fund, which was established under an Agreement and Declaration of Trust, dated April 1, 1967. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as amended from time to time, as though he had actually signed the same.

**Section 2.**    The Employer hereby irrevocably designates as its representatives on the Board of Trustees such trustees as are now serving, or who will in the future serve, as employer trustees, together with their successors. The Employer further agrees to be bound by all actions taken by the trustees pursuant to the said Agreement and Declaration of Trust, as amended from time to time.

**Section 3.**    All contributions shall be made at such time and in such manner as the trustees require; and the trustees may at any time conduct an audit in accordance with Article VI, Section 6 of the said Agreement and Declaration of Trust.

**Section 4.**    If an Employer fails to make contributions to the Pension Fund within twenty (20) days after the date required by the trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provisions hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due together with attorney's fees and such penalties as may be assessed by the trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no-strike" clause which may be provided or set forth elsewhere in this Agreement.

**Section 5.**    The Pension Plan and Annuity Plan adopted by the trustees shall at all times conform with the requirements of the Internal Revenue Code so as to enable the Employer at all times to treat contributions to the PAT International Union and Industry Pension Fund as a deduction for income tax purposes.

## ARTICLE XIII
## HEALTH & WELFARE, PENSION AND TRAINING FUNDS

**Section 1.**    Health and Welfare, Pension and Training Funds ("Funds") have been created.  The Trustees of each Fund shall administer the Fund in accordance with the Trust Agreement for the Fund ("Trust Agreement") and in accordance with policies which they adopt ("Policies").  The terms of the Trust Agreements and Policies are a part of this Agreement by reference.  Contribution rates and collections procedures shall be determined by the Trustees of each Fund.  During the term of this Agreement an amount determined by the Trustees of a Fund to maintain or increase benefits may be deducted from the base wage rate.

**Section 2.**    The Employer's liability for payment under this Article shall not be subject to or covered by any grievance procedure or any "No-Strike" clause which may be set forth elsewhere in this Agreement.

**Section 3.**    In the sole discretion of the Trustees of a Fund, estimators, project managers, project foremen, office personnel, supervisors and company owners may participate in a Fund.

## ARTICLE XIV
## BONDING PROVISION

**Section 1.**  Employers signatory to this Agreement shall execute a Surety Bond or Cash Bond in the principal sum of Five Thousand Dollars ($5,000.00) indemnifying IUPAT Local Union 47's, Health & Welfare and Pension Trust Funds, for any loses incurred resulting from the failure to pay any monies due to the Funds, as provided in the Collective Bargaining Agreement.  Within fourteen (14) days of purchasing said bond, every signatory to this Agreement shall furnish to the IUPAT Local Union 47 and Trust Committee a copy of the Surety Bond or Cash Bond receipt.  **After June 1, 2005, see Section 13 of this Article.**

**Section 2.**  If (1.) the average monthly contributions paid by any signatory Employer to the Health & Welfare Fund and the Pension Fund during the 1993 or any subsequent calendar year (hereinafter referred to as average "Average Monthly Contribution") exceed Five Thousand Dollars ($5,000.00), and (2.) if that signatory Employer was two (2) or more months delinquent on the 20th day of three (3) or more calendar months during that same calendar year, then that signatory Employer shall on or before January 31 of the next calendar year execute an additional Surety Bond or Cash Bond in the principal sum of three (3) times the Average Monthly Contribution, indemnifying IUPAT Local Union 47, and Health & Welfare and Pension Trust Funds, for any losses incurred resulting from failure to pay any monies due to the Funds, as provided in the Collective Bargaining Agreement.  **After June 1, 2005, see Section 13 of this Article.**

**Section 3.**  Bonding forms must be approved by the Board of Trustees of the Health & Welfare Fund and Pension Fund.  **After June 1, 2005, see Section 13 of this Article.**

**Section 4.**  All surety or cash bonds posted in accordance with Section 1 above shall be held by the Union and Trust Committees until the signatory Employer furnishes proof that it is no longer performing work under this Agreement within the jurisdiction of Painters Local 47 and that all financial obligations due under the terms of this Agreement have been fully paid and satisfied.  All Surety or Cash Bonds posted in accordance with Section 2 above shall be held by the Union and Trust Committees until the signatory Employer completes twelve (12) consecutive months during which it is never two (2) or more months delinquent in paying its contributions on the twentieth (20th) day of the month.

**Section 5.**  In the event that any financial obligations under this Agreement are unpaid, the signatory Employer agrees and authorizes the Trust Committees to demand from the bonding company such amount as is due and unpaid, or to execute against the surety Bond or Cash Bond for any such unpaid obligations.

**Section 6.**    The Signatory Employer further agrees that such Surety or Cash Bond shall be subject to any financial liability as determined by the Health & Welfare and Pension Trust Funds in the performance of its duties as set forth in the Agreement.

**Section 7.**    All new signatories to the Agreement must furnish proof by presenting within three (3) days their Workman's Compensation Insurance (Property Damage and Public Liability Insurance), Unemployment Compensation Insurance Numbers and fringe benefit bond ($5,000.00).

**Section 8.**    The Indianapolis Painters Joint Trade Board shall have the authority to adjust the Bonding and Collection Provisions of this Agreement as they may deem necessary by a majority vote of the Board. All Signatory Employers to this agreement must be notified within thirty (30) days and by registered mail, by the Secretary/Treasurer of the Indianapolis Painters Joint Trade Board of any changes made to the Bonding and Collections Provisions of this Agreement.

**Section 9.    Costs of Collection**  If monthly reports of hours worked, which is required above, is not filed with the Funds by the twentieth (20th) day of the month following the month in which the hours were worked, then liquidated damages in the amount of Two Hundred Fifty dollars ($250.00) shall become due and payable immediately.

**Section 10.**  If the monthly contribution payments required above are not received by the Funds on or before the first (1st) day of the second (2nd) month following the month in which the hours were worked, then interest shall begin accruing at the rate of eighteen percent (18%) per year and liquidated damages of five percent (5%) of the total contributions owed for that month shall become due and payable immediately.  If the contributions are still not received by the first (1st) day of the third (3rd) month following the month in which the hours were worked, then liquidated damages of an additional five percent (5%) of the total contributions owed for the month shall become due and payable immediately.  If the contributions are still not received by the first (1st) day of the fourth (4th) month after the month in which the hours were worked, then liquidated damages of an additional five percent (5%) of the contributions owed for the month shall become due and payable immediately.

**Section 11.**  If the Funds file any claim or court action to recover monies due to the Funds, then they shall recover in that claim or action contributions, interest, liquidated damages, attorneys fees, auditor and accountant fees and all costs of collection incurred during the preparation and prosecution of the claim or action to recover the monies owed.

**Section 12.**  If an Employer fails to make contributions to any or all Funds within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provision hereof to the contrary notwithstanding, and the Employer shall be liable for

contributions, interest, liquidated damages, attorneys fees, auditor and accountant fees and all costs of collection incurred during the preparation and prosecution of the claim or action to recover the monies owed. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance procedure or any "NO STRIKE" clause which may be provided or set forth elsewhere in this Agreement.

**Section 13.** Effective June 1, 2005 Sections 1, 2 and 3 above, of this Article, will be replaced by the following language:

### BONDING REQUIREMENTS

**Section 1.**    In order to secure payment of wages, fringe benefits and deductions payable under this Agreement and under any other Agreement requiring a similar security arrangement as identified herein which the Employer or Contractor has with a Local Union affiliated with District Council 91, each Employer or Contractor upon becoming a signatory contractor to this Agreement shall in one of the following ways post security with and in the name of District Council 91 of the International Union of Painters and Allied Trades, AFL-CIO, CLC, and its affiliated Local Unions:

**(a).**    By means of a surety bond in the sum of twenty-five thousand dollars ($25,000) underwritten by a surety company acceptable to District Council 91. Such a bond shall utilize the form which is attached to this Agreement, unless the Union otherwise agrees in writing.

**(b).**    By means of a cash deposit in the sum of twenty-five thousand dollars ($25,000) with a bank or trust company acceptable to District Council 91 provided through an escrow agreement binding such deposit to the payment of wages, fringe benefits and deductions, and any later payment penalties thereto. The Employer or Contractor so depositing such funds shall be entitled to all interest earned by said deposit. The escrow agreement shall utilize the form which is attached to this Agreement and shall be with the escrow agent selected by District Council 91, unless the Union otherwise agrees in writing.

**(c).**    By means of an irrevocable letter of credit with a value of twenty-five thousand dollars ($25,000) with a bank acceptable to District Council 91 with said letter of credit naming the Union as beneficiary. A sight draft shall be drawn on the letter of credit when District Council 91 presents a written statement to the bank stating the amount of unpaid wages, fringe benefits, deductions and any late payment fees thereto. The irrevocable letter of credit shall utilize the form which is attached to this Agreement, unless District Council 91 otherwise agrees in writing.

**(d).**   In those cases in which a contractor cannot obtain the required bonding, the escrow deposit or secure an irrevocable letter of credit, the contractor may become signatory providing the contractor signs a Memorandum of Understanding agreeing to pay the fringe benefits weekly.

**(e).**   Language for the aforementioned bond, escrow agreement, irrevocable letter of credit and weekly payments have been agreed to and approved during negotiations.

**Section 2.**   A surety arrangement posted with District Council 91 (and any of its other affiliated local unions, to the extent that the surety arrangement is "District Council wide") meeting any one of the above requirements will be acceptable for the collection of unpaid wages, delinquent fringe benefits and delinquent deductions (and late fees, to the extent permitted by the particular security arrangement) owed for any work performed under this Agreement provided such surety arrangement can be minimally applied to the delinquent principal amounts (wages, fringe benefits and deductions) occurring under this Agreement.  Separate or duplicate bonding will not be required when the Employer or Contractor works in any jurisdiction covered by District Council 91.  Separate bonding, or its equivalent, may be required by an Agreement the Employer or Contractor may have with the International Union.

## ARTICLE XV
## NO INTERRUPTIONS IN WORK

**Section 1.**   Any employee member of the Union employed as a journeyman and acting in any official capacity whatsoever, shall not be discriminated against for his or her lawful acts as such officer of the Union, nor shall there be any discrimination against any journeyman employee because of Union membership or any other lawful activities.  Likewise, the Union and its officials and members shall not, in any manner whatsoever, discriminate against or in favor of any Employer covered by this Agreement.

**Section 2.**   The Union and all employees in the bargaining unit, individual and collectively, will not, during the life of this Agreement, encourage, cause, permit or take part in any strike, picketing, sit down or walkout of more than a single employee.  Correlative with this provision, the Employer will not engage in a lockout during the term of this Agreement.

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

**Section 1.**    Five (5) minutes shall be allowed for personal cleanup (not brushes or spray) before lunch and ten (10) minutes before quitting time for the same purpose. Spray men shall be allowed ten (10) minutes for personal cleanup before lunch and fifteen (15) minutes before quitting for the same purpose.

**Section 2.**    An employee who is asked to report to a designated job and reports for work, but is not put to work by the Employer shall be allowed two (2) hours "show up" time unless inclement weather or other definite conditions beyond the control of the Employer shall be the reason for not working.

**Section 3.**    The Business Representative of the Union shall be allowed on any job where members of the Union are employed and where there is no objection by the owner or regular occupant of the premises.

**Section 4.**    All Employers who are parties to this Agreement shall make adequate and proper provisions for the health and safety of all employees covered hereunder. All such Employers shall comply with all health and safety regulations and requirements of governmental agencies and insurance agencies having jurisdiction over said health and safety regulations and rules, regulations and requirements of governmental agencies.

**Section 5.**    In the event of discharge, layoff, or should the employee quit, the employee shall receive full restitution for their actual hours worked on the first (1st) regular payday following such action. In the event of a bad check or payment of wages is prolonged, extra compensation to employee shall be as determined by the Indianapolis Painters Joint Trade Board

**Section 6.**    Unless otherwise specified, any Committee now in existence, or which may come into existence, to assist in the operation of this Agreement and which requires an equal number of Union members, and an equal number of signatory Employers, shall be composed in all instances only of individuals who, if representing the Union, are members in good standing with the Union and if representing the Employers, are signatory to this Agreement.

**Section 7.**    Two (2) ten (10) minute breaks will be allowed per eight (8) hour shift, at times designated by the Employer.  All breaks will be given and taken in the area where the work is being performed.

**(a).**    The afternoon break can be eliminated by mutual consent between employee and employer if the following criteria are met:

- An afternoon break elimination authorization card is signed by the employer (or employer representative) and the employee
- The afternoon break elimination authorization card, signed by both parties, is delivered to the Local #47 Union Hall office, 6501 Massachusetts Ave., Indianapolis, IN, 46226
- Employer increases employee hourly wage by one dollar ($1.00)

**(b).**    Once an afternoon break elimination authorization card has been successfully completed and delivered to the Union Hall, the employer and employee will be bound to the elimination of the afternoon break until the next annual anniversary date of this Agreement.  If it is mutually agreed between the employee and employer to continue the afternoon break elimination policy at the annual anniversary of this Agreement, both parties must sign a new authorization card, and remit said card to the Union Hall office.

**(c).**    A new afternoon break elimination card must be successfully completed by a member who changes employers, if they and their new employer mutually desire to participate in the afternoon break elimination policy.

**(d).**    Participation for employers and members in the afternoon break elimination policy is completely voluntary, and must always be mutually agreed between both parties.

**Section 8.**    The Employer and/or the Union shall not discriminate against any person because of age, race, sex, national origin, ancestry or religion in the hire, discharge, transfer, layoff, discipline or in the assignment of jobs or with respect to any other terms and conditions of employment.

**Section 9.**    The management of each Employer's operations and directions of working forces, including but not limited to the right to employ, promote, demote, train, transfer, lay-off and to discipline, suspend or discharge for just cause and to assign work and to increase and decrease the working force, to schedule the operations and make such rules and regulation in connection with the operations and the conduct and duties of employees as are deemed advisable is vested exclusively in the Employer, subject only to such limitations as are contained in this Agreement.

## ARTICLE XVII
## STEWARDS

Stewards will be appointed at the discretion of and by the Business Manager/Secretary Treasurer of District Council 91. The Employer will be notified by letter of the appointed Steward. In all cases, the Steward in local shops must be appointed from within the regular employees of the Employer. The Shop Steward or Job Steward shall be qualified to perform the work involved. The Shop or Job Steward shall see that all employees working in the shop or on the job are in good standing with the Union and the Agreement is being complied with, any irregularities will be reported to the District Council Business Representative. For out-of-area Employers only, in case of a temporary shut down of the job, the Shop Steward or Job Steward shall be the last person laid off and the first person called back with reasonable consideration for the Employer's supervision. Foremen cannot serve as Shop Steward or Job Steward.

## ARTICLE XVIII
## INDIANA UNION CONSTRUCTION RESOURCE CENTER (IUCRC)
## SUBSTANCE ABUSE POLICY

Effective June 1, 2004, the parties hereby agree to participate in the Indiana Union Construction Resource Center (IUCRC) Substance Abuse Policy with respect to all bargaining unit employees by adopting the IUCRC's current policy booklet and its By-Laws and all future revisions thereof upon reasonable notice being given. The Union hereby accepts the current union representatives (and their successors) who serve on the IUCRC Board of Directors and the Employer hereby accepts the current representatives (and their successors) who serve on the IUCRC Board of Directors.

The Employer will contribute to the IUCRC at the rate designated in ARTICLE VI, Sections 4(a) and 5 in this agreement under the column entitled DRUG AND ALCOHOL for each hour worked by each bargaining unit employee of the Employer covered by this Agreement. Employers hereby further agree that if the contribution rate changes during the length of this Agreement, that they will in turn pay the revised hourly contribution rate as established by the IUCRC Board of Directors.

The parties further agree that that the responsibility for the collection of funds for the IUCRC will be solely between the IUCRC Board of Directors and the signatory Employers to this Agreement individually and collectively.

In the event an Employer works a jobsite where the customer requires outside construction workers to have a "MICCS" card or some other drug program certification, the Union and the Employer agree that they will send a joint letter stating their promotion and use of the IUCRC program in a good faith effort to convince the

customer to accept the IUCRC. In the event the customer still will not recognize the IUCRC, then the Union and the Employer agree that the customer's mandated policy will be accepted. However, no bargaining unit employee will be disciplined for refusing to take the customer mandated drug/alcohol test. In the event an employee does refuse to take the customer-mandated tests, the Employer will make a good faith attempt to place that employee on another job and, if not possible, the employee will receive a lay-off with the right of recall.

## ARTICLE XIX
## INDIANAPOLIS AND AREA WIDE JOINT TRADE BOARD AND GRIEVANCE PROCEDURE

### Section 1.    Grievance

(a).    In the event a dispute arises over the interpretation of any clause in this Agreement, or a grievance arises as to the application of this Agreement, the parties involved shall first make every effort to settle the dispute.

(b).    All parties to this Agreement shall have the right to file a grievance.

(c).    In the event the Local Union's representative and the Employer's representative cannot resolve the grievance, either party may put the Grievance in writing, submitting one (1) copy to the other party and a duplicate copy to both the Chairman and the Secretary of the Local Joint Trade Board.

### Section 2.    Local Joint Trade Board

(a).    There shall be a permanently constituted Local Joint Trade Board consisting of three (3) members appointed by the Business Manager/Secretary Treasurer of District Council 91 and three (3) members appointed by the local contractors. In odd numbered years, the contractors in that Local Union's territorial jurisdiction shall appoint the Chairman of the Local Joint Trade Board and the Business Manager/Secretary Treasurer shall appoint the Secretary of the Local Joint Trade Board. In even numbered years, the offices shall be reversed although, by joint agreement, the parties may decide not to alternate offices. In the event that either or both the Chairman or Secretary are the griever or grieved party of the grievance submitted to the Local Joint Trade Board, then, a Chairman pro tem and/or a Secretary pro tem, as the case may be, shall fill the office for that particular grievance only. Neither the Union representative who filed/responded to the verbal grievance nor the Employer representative who filed/responded to the verbal grievance shall serve as a member of

the Local Joint Trade Board hearing the submitted written grievance. No Employee shall sit as a member of the Trade Board on any case when he or his Employer is involved, either directly or indirectly, nor shall any Employer signatory to this Agreement act as a member of the Joint Trade Board on any case when he or one of his Employees is directly or indirectly involved.

(b).    In order for a grievance to be processed, all grievances will be made in writing to one (1) of the full-time District Council representatives within ten (10) working days of the occurrence of the problem that prompted the grievance or the grieving party became aware of the problem. No procedures adopted for the processing of grievances shall prevent District Council 91 itself from initiating a grievance if deemed necessary by the Business Manager/Secretary Treasurer.

(c).    Upon receipt of the written grievance by the Local Joint Trade Board's Secretary, the Local Joint Trade Board shall conduct a hearing of the grievance at the next scheduled meeting of the Local Joint Trade Board (providing there is at least ten (10) days to prepare) or at an earlier date if deemed necessary at the discretion of the Local Joint Trade Board Chairman or Secretary. The Secretary shall forward a copy of the grievance to the Business Manager/Secretary Treasurer of District Council 91 and to the contractors' appointed officer on the Area-Wide Joint Trade Board, as detailed below. The Local Joint Trade Board Chairman shall chair the hearing. The Local Joint Trade Board's Secretary shall take the notes of the hearing, retain copies of any documents submitted to the Local Joint Trade Board and shall prepare the decision.

(d).    The Local Joint Trade Board shall reach its decision within three (3) business days after the hearing and shall mail by certified mail, return receipt requested, a copy of the decision to the grieving/grieved Union representative and grieving/grieved Employer representative within five (5) business days of the hearing. A copy of the decision shall also be sent to the Business Manager/Secretary Treasurer of District Council 91 and to the contractor Officer of the Area-Wide Joint Trade Board.

(e).    In case any of the members of the Local Joint Trade Board are disqualified from sitting as Board members due to participation in the verbal grievance then the remaining Board members for each group (Union/Employer) may either proceed with its two (2) remaining members or may appoint its own replacement for the disqualified individual. Whatever decision is made with respect to replacing a disqualified Board member, each group shall still have a full complement of three (3) votes to exercise. A quorum shall exist for the hearing so long as at least one (1) Union and one (1) Employer Board member are in attendance at the hearing. For illustration purposes only, if the Union has only one (1) Board member in attendance such individual shall have three (3) votes. If the contractors have two (2) Board members in attendance at the hearing, each contractor member shall have one and one-half (1 ½) votes.

**(f).**    In the event a hearing is not conducted at the next scheduled or special meeting after submission of the written grievance to the Local Joint Trade Board, or if there is no quorum at the scheduled or special Local Joint Trade Board hearing, or if the Local Joint Trade Board deadlocks on the written grievance, then the grieving party may automatically refer the grievance to the District Council 91 Area-Wide Joint Trade Board by submitting a letter referring the grievance to the District Council 91 Area-Wide Joint Trade Board.

### Section 3.    District Council 91 Area-Wide Joint Trade Board a/k/a Area-Wide Joint Trade Board

**(a).**    There will be a permanently established District Council 91 Area-Wide Joint Trade Board which shall be composed of the District Council 91 Business Manager/Secretary Treasurer and the appointee of the contractor Officers of all of the Local Joint Trade Boards which wish to participate in the selection process of the contractor officer of the Area-Wide Joint Trade Board. Additionally, the Business Manager/Secretary Treasurer shall appoint a representative from each Local Union affiliated with the District Council and each Local Union's counterpart territorial contractors shall each be entitled to appoint one (1) member to the District Council 91 Area-Wide Joint Trade Board.

**(b).**    District Council 91's Business Manager/Secretary Treasurer and the Area-Wide Joint Trade Board Employers' selected member officer shall serve as Secretary and Chairman, respectively, and shall alternate offices each year, if one or both of such individuals so requests. In the event that the Area-Wide Employer officer is the grieving/grieved party with respect to the grievance to be heard then an alternate shall be selected by those Employers' Area-Wide Joint Trade Board members who are in attendance at the hearing.

**(c).**    Once a grievance is referred to the District Council Area-Wide Joint Trade Board for any of the reasons set forth in Section 2 (e), a hearing shall be scheduled as soon as possible by the Area-Wide Joint Trade Board's officers.

**(d).**    Neither the members of the Local Joint Trade Board from which the grievance is submitted nor any members of the Local Trade Board in which the grieving/grieved Employer has its principal office shall sit on the Area-Wide Joint Trade Board for that particular grievance.

**(e).**    A quorum for the District Council 91 Area-Wide Joint Trade Board shall consist of a minimum of three (3) Employer members and three (3) Union members. Whichever side (Union or Employer) has the most members at the hearing shall have that number be its total vote, with each member having one (1) vote. The side having

the lesser number of members present shall have the same total number of votes which shall be allocated among its members present to ensure that an equal number of votes are being cast. For example, if ten (10) Employer members are present and five (5) Union members are present then each Employer member shall have one (1) vote and each Union member shall have two (2) votes.

**(f).** The Area-Wide Joint Trade Board shall reach its decision by no later than three (3) days after the hearing and shall mail the decision by certified mail, return receipt requested, to the grieving and grieved parties as soon as reasonably possible thereafter.

**(g).** In the event of a deadlock by the Area-Wide Joint Trade Board, the grieving party shall have fifteen (15) days to notify the officers of the Area-Wide Joint Trade Board of its desire to proceed to arbitration. The officers shall then work with the grieving and grieved party on mutually selecting an Arbitrator within seven (7) days after the referral to Arbitration. If the parties are unable to mutually select an Arbitrator, then they shall contact the Federal Mediation and Conciliation Service to obtain a panel of at least seven (7) nationally recognized arbitrators from which an Arbitrator shall be selected.

**(h).** The Arbitrator may consider only the particular issue or issues presented to him in the written grievance. The authority of the Arbitrator is strictly limited to the interpretation or application of the existing terms of this Agreement and any amendments and Addenda, thereto.

## Section 4.    Authority of the Local and Area-Wide Joint Trade Boards

**(a).** The Local Joint Trade Board shall hold regular monthly meetings, or shall meet at any time deemed necessary by one or both of its officers and shall meet to conduct grievance hearings as detailed above. The Area-Wide Joint Trade Board shall meet as deemed necessary by the Business Manager/Secretary Treasurer and or the Contractor Officer.

**(b).** Each Joint Trade Board is authorized to impose fines and to issue directives against a party held to have violated this collective bargaining agreement.

**(c).** Each Joint Trade Board is authorized to request and to receive whatever records are necessary to resolve the grievance being heard and to call before them all parties concerned.

**(d).** Any failure to supply documentation or to produce a witness deemed necessary by each Joint Trade Board shall be the basis for denying or granting the grievance as the case may be.

**(e).**    Fines assessed as part of a Joint Trade Board decision may be directed to be paid to charitable organizations or another mutually agreed upon entity including but not limited to the Local or Area-Wide Joint Trade Boards.

**(f).**    Expenses and fees of arbitration shall be shared equally by the parties.

## Section 5.  General Principles

**(a).**    The decisions of the Local and Area-Wide Joint Trade Boards as well as by an Arbitrator shall be final and binding on all persons and entities seeking to enforce rights and obligations created by the particular parties' collective bargaining agreement.

**(b).**    There shall be no strikes or lockouts during the terms of this Agreement, except with respect to a party which has failed to cooperate in the grievance process or to abide by a decision of the Local or Area-Wide Joint Trade Board and with respect to an Employer's failure to pay the required contractual wages, fringe benefits and deductions.

**(c).**    All actions and decisions taken by each Local Joint Trade Board and by the Area-Wide Joint Trade Board and their members shall be made as a Joint Board.  No individual representative and/or officer shall have any personal liability for serving in such position.

**(d).**    Each Joint Trade Board shall set up a financial budget, keep accurate records of all income and expenditures and be entitled to employ any professionals deemed necessary to aid in its consideration of a grievance.

**(e).**    All expenditures made by the Joint Trade Board shall be limited to costs incurred in the administration of this Agreement and the general promotion of the industries covered by this Agreement.

**(f).**    A party's utilization or failure to utilize the procedures set forth in this Article shall not interfere with any legal rights otherwise available to the ERISA Funds identified in this Agreement.

## Section 6.    Guiding Principles

**(a).**    It is agreed that it is unfair for any person to be bound by the terms of this Agreement unless all other persons hereto observe likewise.

**(b).**    It is recognized that it would constitute unfair competition for any Employer to observe the wages and working conditions agreed upon while its competitor ignored wages and conditions.

**(c).**    It is further recognized that signatory contractors and the Union owe their very existence to the principles embodied in this Agreement and to the furtherance of harmonious relations between signatory contractors and the Union.

### Section 7.    Additional Authority

**(a).**    The Local Joint Trade Boards and the Area-Wide Joint Trade Board may consider and recommend amendments and addenda to the collective bargaining agreements during their terms.  Such recommendations shall be subject to ratification by the negotiating parties in order to be implemented.

## ARTICLE XX
## TERMINATION

**Section 1.**    This Agreement shall be in full force and effective from June 1, 2004 to and including May 31, 2009 and shall continue from year to year thereafter unless written notice of a desire to modify or terminate the Agreement, is served by either party upon the other not less than sixty (60) days, and not more than ninety (90) days prior to May 31, 2009 or May 31 of any subsequent contract year.

**Section 2.**  This Agreement shall be subject to change or supplement at any time by mutual consent of the parties hereto.  Any such change or supplement agreed upon shall be reduced to writing, signed by the parties hereto and submitted to the office of IUPAT Local Union 47.  The existing provisions of the Agreement shall remain in force and effect until a conclusion is reached in the matter of any proposed changes.

**Section 3.**    Two (2) original, jointly signed Memorandums of Agreement are to be signed by the Employer and the District Council 91 Business Representative from Local Union 47 (or another authorized representative of District Council 91).  One (1) original of the Memorandum of Agreement will be retained by the Employer and the other original Memorandum of Agreement will be retained by the Union.

WW/LU Negotiations/Neg 47/LU47 contract 2004 Final 051904.doc



# International Union of Painters and Allied Trades, AFL-CIO, CLC
## District Council 91

409 Millner Industrial Drive • Evansville, Indiana 47710
PHONE: 812-962-9191 • FAX: 812-425-4890

**INDIANA • ILLINOIS • KENTUCKY • TENNESSEE**

*Wyman L. Wedding, Business Manager/Secretary Treasurer*

**INDIANA**

PLU # 47 - INDIANAPOLIS
317-546-5638

PLU #80 - LAFAYETTE
765-477-7848

PLU #156 - EVANSVILLE
812-425-4414

PLU #197 - TERRE HAUTE
812-232-1644

PLU #460 - NW INDIANA
219-947-0420

PLU #469 - FORT WAYNE
260-484-7924

PLU #669 - ANDERSON
765-378-5242

PLU #1118 - SOUTH BEND
574-287-8200

GLU #1165 - IN, KY, IL

EVANSVILLE
812-962-0652

FORT WAYNE
260-484-7924

GARY
219-947-0420

INDIANAPOLIS
317-542-7617

SOUTH BEND
574-287-8200

**KENTUCKY**

PLU # 118 - LOUISVILLE
502-366-2233

PLU # 500 - PADUCAH
270-441-7697

**TENNESSEE**

PGLU # 456 - NASHVILLE
615-255-7863

April 30, 2003

Mr. George Galis, General Secretary Treasurer
International Union of Painters
    and Allied Trades AFL-CIO, CLC
1750 New York Avenue, NW
Washington, DC  20006



Re:  New Collective Bargaining Agreement, Local 669 of DC 91

Dear Sir and Brother:

I am pleased to report that a new Collective Bargaining Agreement has been negotiated and ratified for Local Union 669, Chesterfield, Indiana affiliated with District Council 91.

I am submitting three copies of the aforementioned Agreement for your files and approval by the General Executive Board.  The exact language required by the General Constitution has been incorporated in the new Agreement.

All of the signatory contractors in the Local 669 area have agreed to the terms and conditions of the new Agreement even though we still have a few contractors that need to sign the Memorandum of Agreement.  I am enclosing a list of the signatory contractors with Local 669 and a copy of a Memorandum of Agreement signed by Odle, Inc. as an example.  As soon as the entire block of contractors have executed the Agreement I will forward a copy of the Agreement and all the Signatures to the Pension office.

Fraternally yours,

Wyman L. Wedding, BM/ST
District Council 91

Copy:

General Vice President Price III
General President's Representative Zell
Business Representative Sides, Local 669
Fund Administrator Meyers
Locals/LU 669/GST Agreement filing 043003



EXHIBIT

2(b)



RECEIVED

MAY 0 6 2003

G.S.T

# Articles of Agreement
# Effective April 1, 2003

between the

# Painting Contractors
# Of Chesterfield and Vicinity

and

# Painters and Drywall Finishers Local 669
# P.O. Box 42
# Chesterfield, Indiana  46017

## phone  765-378-5242
## fax  765 378-0486

### Affiliated with

# District Council 91
# International Union of Painters
# and Allied Trades AFL-CIO, CLC

**409 Millner Industrial Drive**
**Evansville, Indiana  47710**

**phone  812-962-9191**
**fax  812-425-4890**

This Agreement entered into and becoming effective this 1st day of April, 2003, by and between Contractors of Local Union 669's Jurisdiction, (hereinafter referred to as the Employer) and Painters Local Union 669, affiliated with District Council 91 of the International Union of Painters and Allied Trades AFL-CIO, CLC (hereinafter referred to as the Union).

**Witnesseth that:**

Whereas the Union is recognized as the collective bargaining representative for all District Council 91, Local Union 669 members employed by the Employers in the jurisdictional area of Local Union 669.

Whereas, the parties have had negotiations concerning the wages, fringe benefits, terms and conditions of employment and arrived at an Agreement thereon;

Now, therefore, in consideration of the mutual promises and undertakings herein contained, it is agreed by and between the parties hereto that the following shall constitute and be the entire Agreement between the parties hereto in respect to rates of pay, fringe benefits, hours of work and other conditions of employment for and during the term of this Agreement.

## ARTICLE I
## JURISDICTIONAL BOUNDARIES

Local Union 669's territorial jurisdiction includes the counties of Blackford, Delaware, Fayette, Franklin, Henry, Howard, Jay, Madison, Miami, Randolph, Rush, Tipton, Union, and Wayne Counties in the State of Indiana.

## ARTICLE II
## RECOGNITION AND BARGAINING UNIT

**Section 1.**    The employer recognizes, acknowledges, and agrees that District Council 91, Local Union 669 is, within the meaning of Section 9 (a) of the National Labor Relations Act, the exclusive representative for the purpose of collective bargaining, of all the Employer's employees wherever such employees may be employed, in the following classifications of work:

All painting, decorating, drywall finishing, paperhanging, hardwood and furniture finishing, waxing, oiling, staining, or the removal of all such finishes or materials from any and all surfaces, including, intumescent fire retardant coatings also all lead abatement and application of all asbestos encapsulation. Also, all preparatory work incidental to the painting or decorating of any surface and, wherever possible, washing and cleaning of all painted or decorated surfaces with liquid steam, sandblast, or other method. Also whenever possible, the cleaning up of painter's waste materials and spills, and such other work as may be designated as painters' in the latest issue of the General Constitution of the International Union of Painters and Allied Trades under caption "Jurisdiction". Also the operation and care of all tools and equipment used to perform said work, including, but not limited to, brushes, rollers, spray painting equipment, sandblasting equipment, miscellaneous hand and power tools, ladders, scaffolding and other rigging and similar or related classification.

**Section 2.**     It shall be incumbent upon every Contractor signatory to this agreement to exert every effort to accomplish all work falling under the jurisdiction of paint contracting, including the taping of drywall construction and the finishing of floors, and the installing of epoxy floor covering. Furthermore, the Union shall endeavor to resist the infringement of non-signatory employers into the Jurisdiction of this Local.

**Section 3.     Principle Place of Business and Employment:** It is being understood that the principle place of business and employment of the Employer is the present geographical jurisdiction of Local Union 669 or changes herewith.

## ARTICLE III
## CONDITIONS OF AGREEMENT

**Section 1.     Preservation of Work Clause.** To protect and preserve, for the employees covered by this agreement, all work they have performed and all work covered by this agreement, and to prevent any device or subterfuge to avoid the protection and preservation of such work, it is agreed as follows: If the employer performs on-site construction work of the type covered by this agreement, under its own name or the name of another, as a corporation, company, partnership, or other business entity, including a joint venture, wherein the Employer, though its officers, directors, partners, owners, or stockholders, exercises directly or indirectly (through family members or otherwise), management, control, or majority ownership, the terms and conditions of this agreement shall be applicable to all such work.

**Section 2.**     All charges of violations of Section I of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this agreement on the handling of grievances and the final and binding resolution of disputes. As a remedy for violations of this article, the Joint Trade Board or Arbitrator shall be able, at the request of the Union, to require an Employer to pay 1) to affected employees covered by this agreement, including registered applicants for employment, the equivalent of wages those employees have lost because of the violations, and 2) into the effected Joint Trust Funds to which this agreement requires contributions any delinquent contribution that resulted from the violations. The Joint Trade Board or Arbitrator shall be able also to provide any other appropriate remedies, whether provided by the law or this agreement. The Union shall enforce a decision of the Joint Trade Board or Arbitrator under this Article only through arbitral, judicial, or governmental, for example, the National Labor Relations Board channels.

**Section 3.**     If, after an Employer has violated this Article, the Union and/or the Trustees of one or more Joint Trust Funds to which this agreement requires contributions institute legal action to enforce an award by an Arbitrator or the Joint Trade Board remedying such violation, or defend any action that seeks to vacate such award, the Employer shall pay any accountants' and/or attorneys' fees incurred by the Union and/or the Joint Trust Funds, plus costs of the litigation, that have resulted from such legal action. This section does not effect other remedies, whether provided by law or this Article, that may be available to the Union and/or the Joint Trust Funds.

**Section 4.**     The contractor or the employer party to this agreement, when engaged in work outside the geographic jurisdiction of the Union party to this agreement, shall employ not less than fifty percent (50%) of the workers employed on such work from the residents of the area

3

where the work is performed or from among persons who are employed the greater percentage of their time in such locality; provided they possess the necessary skills to perform the work.

**Section 5.**    The Employer party hereto shall, when engaged in work outside the geographic jurisdiction of the Union party to the agreement, comply with all of the lawful clauses of the Collective Bargaining Agreement in effect in said other geographic jurisdiction and executed by the employers of the industry and the affiliated Local Unions in that jurisdiction, including but not limited to, the wages, hours, working conditions, fringe benefits, and procedure for settlement of grievances set forth therein; provided, however, that as to employees employed by such employer from within the geographic jurisdiction of the Union party to this agreement and who are brought into an outside jurisdiction, such employees shall be entitled to receive the wages and conditions effective in either the home or outside jurisdiction, whichever are more favorable to such employees, and future benefit contributions on behalf of such employees shall be made solely to their home funds in accordance with their governing documents. This provision is enforceable by the District Council or Local Union in whose jurisdiction the work is being performed, both through the procedure for settlement of grievances set forth in its applicable Collective Bargaining Agreement and though the courts, and is also enforceable by the Union Party to this Agreement, both through the procedure for settlement of grievances set forth in this agreement and though the courts. The Employer shall not be permitted to evade its obligation hereunder by setting up an additional "home" or "branch" office or plant in an area outside its principle place of business.

**ARTICLE IV**
**UNION SECURITY CLAUSE**

All present employees who are members of the Union on the effective date of this Agreement or the date of execution of this Agreement, whichever is the latter, shall remain members of the Union in good standing as a condition of employment. All present employees who are not members of the Union and all employees who are hired hereafter shall become and remain members in good standing of the Union as a condition of employment on and after the eighth day following the beginning of their employment, or on and after the eighth day following the effective date of the Agreement, or the date of execution of this Agreement, whichever is the later.

The Employer agrees to make a good faith effort to notify the Union of new employees who have not joined the Union.

**ARTICLE V**
**MANAGEMENT RIGHTS**

**Section 1.**    It is expressly understood and agreed that the employer shall have entire freedom of selectivity in hiring, providing there shall be no discrimination on the part of the Employer, against any employee or applicant for employment because of his or her union membership, or union activity or because of his or her non-union membership, or because of age, sex, race, creed or color; likewise, the Union and its officials and members shall not in any way or manner whatsoever, discriminate against or in favor of an Employer of employees covered by this Agreement.

**Section 2.**    In the exercise of its function of management, the Employer shall have the right to

4

plan, direct and control the operation of all work; hire employees and foremen; direct the working forces; assign employees and foreman to their jobs; discharge, suspend or discipline for proper causes; transfer, promote or demote employees and foremen; lay off employees and foremen because of lack of work or for other legitimate reasons; require employees and foremen to observe the Employer's rules and regulations not inconsistent with this Agreement; regulate the use of all equipment and other property of the Employer; decide the amount of equipment to be used, the number of men needed, and shall be free to contract work anywhere and shall decide the methods of work and the source from which material and equipment is obtained; provided, however, that the Employer will not use these rights for the purpose of discriminating against any employee. These provisions do not prohibit the Union's right to the peaceful exercise if in its judgment the spirit and intent of this Agreement has been violated.

# ARTICLE VI
# WAGES

**Section 1.    Journeyman Wages**
## APRIL 1, 2003 TO APRIL 1, 2004

| | BASE WAGE | H/W FUND | PENSION FUND | Local 669 APPRENTICESHIP IUPAT-JATF | LABOR MANAGEMENT COOPERATION FUND | TOTAL |
|---|---|---|---|---|---|---|
| BRUSH/ROLL | $18.67 | $3.58 | $2.30 | $0.14 | $0.05 | $24.74 |
| SPRAY/WATERBLASTING | $19.67 | $3.58 | $2.30 | $0.14 | $0.05 | $25.74 |
| SAND BLASTING | $19.67 | $3.58 | $2.30 | $0.14 | $0.05 | $25.74 |
| DRYWALL AND FINISHERS | $18.67 | $3.58 | $2.30 | $0.14 | $0.05 | $24.74 |
| AUTOMATIC DRYWALL TOOLS | $19.17 | $3.58 | $2.30 | $0.14 | $0.05 | $25.24 |
| VINYL WALLCOVERING & PAPERHANGING | 18.67 | $3.58 | $2.30 | $0.14 | $0.05 | $24.74 |

## APRIL 1, 2004 TO APRIL 1, 2005

| | BASE WAGE | H/W FUND | PENSION FUND | Local 669 APPRENTICESHIP IUPAT-JATF | LABOR MANAGEMENT COOPERATION FUND | TOTAL |
|---|---|---|---|---|---|---|
| BRUSH/ROLL | To be determined | To be determined | To be determined | To be determined | $0.05 | $25.64 |
| SPRAY/WATERBLASTING | To be determined | To be determined | To be determined | To be determined | $0.05 | $26.64 |
| SAND BLASTING | To be determined | To be determined | To be determined | To be determined | $0.05 | $26.64 |
| DRYWALL AND FINISHERS | To be determined | To be determined | To be determined | To be determined | $0.05 | $25.64 |
| AUTOMATIC DRYWALL TOOLS | To be determined | To be determined | To be determined | To be determined | $0.05 | $26.14 |
| VINYL WALLCOVERING & PAPERHANGING | To be determined | To be determined | To be determined | To be determined | $0.05 | $25.64 |

An increase of $.90 (ninety cents) the second year of the Agreement with at least $.50 (fifty cents) going toward fringes with at least $.05 of the $.50 to be applied toward apprenticeship and training.

## APRIL 1, 2005 TO APRIL 1, 2006

| | BASE WAGE | H/W FUND | PENSION FUND | Local 669 APPRENTICESHIP IUPAT-JATF | LABOR MANAGEMENT COOPERATION FUND | TOTAL |
|---|---|---|---|---|---|---|
| BRUSH/ROLL | To be determined | To be determined | To be determined | To be determined | $0.05 | $26.54 |
| SPRAY/WATERBLASTING | To be determined | To be determined | To be determined | To be determined | $0.05 | $27.54 |
| SAND BLASTING | To be determined | To be determined | To be determined | To be determined | $0.05 | $27.54 |
| DRYWALL AND FINISHERS | To be determined | To be determined | To be determined | To be determined | $0.05 | $26.64 |
| AUTOMATIC DRYWALL TOOLS | To be determined | To be determined | To be determined | To be determined | $0.05 | $27.04 |
| VINYL WALLCOVERING & PAPERHANGING | To be determined | To be determined | To be determined | To be determined | $0.05 | $26.54 |

An increase of $.90 (ninety cents) the third year of the Agreement with at least $.05 going toward apprenticeship and training and the understanding that the membership can determine how much of the remaining $.85 will be applied toward wages or fringe benefits.

**Section 3.    Apprenticeship Wage Rates**

| | |
|---|---|
| First Year-First 6 months | 50% of journeymen job classification rate |
| First Year-Second 6 months | 60% of journeymen job classification rate |
| Second Year-First 6 months | 65% of journeymen job classification rate |
| Second Year-Second 6 Months | 70% of journeymen job classification rate |
| Third Year-First 6 Months | 75% of journeymen job classification rate |
| Third Year-Second 6 months | 80% of journeymen job classification rate |
| Fourth Year-First 6 months | 85% of journeymen job classification rate |
| Fourth Year-Second 6 months | 90% of journeymen job classification rate |

**Apprenticeship Fringe Benefits**

Apprenticeship fringe benefits are the same as journeyman with the following exceptions;

| | April 2003 | April 2004 | April 2005 |
|---|---|---|---|
| Health & Welfare | $3.58 | TBD | TBD |
| Pension first six months | $0.10 | $0.10 | $0.10 |
| Pension second six months | $2.30 | TBD | TBD |
| Pension second year | $2.30 | TBD | TBD |
| Pension third year | $2.30 | TBD | TBD |
| Pension Fourth year | N/A | TBD | TBD |

**Section 4.**    The union membership shall have the right to direct all or any portion of the wage increase toward payment of fringe benefit contributions in the Union's sole discretion subject to provisions of **Article VI, Section 1**.  However, the distribution will be determined by January 1, of each new year of this Agreement.

**Section 5.    Pre Apprentice**

The term "Pre-Apprentice" as used herein shall be any employee working under the supervision of a painter or supervisor for the purpose of performing work in the painting and decorating industry.  The pre-apprentice shall be paid at the scale of forty percent (40%) of the current journeyman base scale with no fringe benefits (Health and Welfare or Pension).  After a period of ninety (90) days the employee must register as an Apprentice.

The employer may hire one (1) pre-apprentice if they employ five (5) Local Union 669 journeymen.  Any additional pre-apprentice may be hired at the ratio of one (1) pre-apprentice to five (5) Local Union 669 journeymen.

**ARTICLE VII**
**WORKING CONDITIONS**

**Section 1.**    The basic work day shall consist of no more than eight (8) hours commencing as early as 6:00 A.M. and ending no later than 6:00 P.M.  The basic work week shall consist of forty (40) hours, Monday through Friday.  A ten (10) hour, four (4) day work week will be allowed, Monday through Friday, upon request and through mutual agreement between the Employer and the Union Business Representative.

A.    All hours in excess of the regular work day and work week shall be considered overtime.  Overtime on days recognized as regular work days shall be paid for at a rate of time and one-half (1 1/2) of the hourly rate.

B.    All work performed on Saturday will be at a rate of time and one-half (1 1/2) of the hourly rate.

C.    All work performed on Sunday and Holidays will be paid at double the hourly rate.

**Section 2.    Night Work**    Work performed between the hours of 6:00 P. M. and 6:00 A.M., Monday through Sunday, shall pay one dollar ($1.00) above the prevailing day rate, whenever fifty percent (50%) or more of the total hours worked on that shift falls within the Night Work time period, all hours worked on that shift shall pay the Night Work Premium.

**Section 3.    Foremen**    Foremen will be paid the regular rate of pay for the type of work performed plus seventy-five cents ($0.75) for each hour worked.

**Section 4.    Holidays**    All work performed on the following holidays: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving, and Christmas Day, shall be paid for at double the regular straight time rate of pay.

**Section 5.    Labor Day**    No work shall be performed on Labor Day, except in case of emergency, and then only after permission is granted by the Union.

**Section 6.    Pay Periods**    Wages shall be paid weekly by check.  The payroll period shall be any seven (7) day period.  The employer shall hold back no more than five (5) normal working days.  In the event an employee is not paid by quitting time on the employer's regular pay day, the employee will be paid time and one-half the regular hourly rate of pay while waiting for his check (week days only), provided all uniforms, tools and/or equipment provided by the employer have been returned, and based on up to eight (8) hours for each day of waiting time.

Once a contractor has established his pay period and regular pay day, they cannot be changed without prior approval from Local Union 669.

**Section 7.    Show Up Time**    All employees who report for work shall receive two (2) hours pay, except when work can not be performed due to inclement weather or any other cause beyond the contractor's control.

**Section 8.    Breaks**    Two (2) ten (10) minute breaks will be allowed per work day. Breaks are to occur at the mid point between starting time and lunch: and lunch and quitting time (i.e. 9:30 A.M. and 2:00 P.M.).

**Section 9.    Tools**    Employees shall furnish and maintain clean white uniforms.  Each employee shall furnish a duster, scrapers, putty knifes, an olefin knife, pliers and screwdrivers and be prepared to show contractor or supervisor when requested.

**Section 10.    High Time**    Hourly rates for stage, chair work, for open steel (structures with

no, or uncompleted roof or walls), high pay for heights above thirty-six (36) feet is to be paid the regular rate plus one dollar ($1.00) for each hour worked.

**Section 11.    Drywall Tools**       Employees that are required to use their own personal tools for drywall finishing work will be paid a premium of twenty-five cents ($0.25) per hour above journeyman scale.

    **A.**       Employees that are required to work with Ames Tools (i.e. Banjo, Bazooka, etc.) for drywall finishing work will be paid a premium of fifty cents ($0.50) per hour above journeyman scale.

    **B.**       If the employee is required to use their personal tools along with Ames Tools they shall receive the twenty-five cents ($0.25) per hour above journeyman scale for personal tools and the fifty cents ($0.50) per hour above journeyman scale for using Ames Tools for a total of seventy-five cents ($0.75) per hour above journeyman scale.

**Section 12.    Personal Clean-up**    Five (5) minutes shall be allowed for personal clean-up (not equipment) before lunch, and fifteen (15) minutes before quitting time.

**Section 13.    Living and Mileage**

**Home Territory**       All work performed inside the territorial jurisdiction of Local 669 will be a free zone.

**Zone 1. Mileage**

    **Mileage shall be defined as follows:** (See attached map)

**Northern Area**       All areas North of Highway 18 for forty (40) miles constitutes the Northern area.

**Western Area**       All areas West of Highway 421, 43, and 231 constitutes the Western area.

**Southern Area**       All areas South of the Northern part of Interstate 465 and Interstate 74 but North of the South county line of Morgan and Johnson Counties, Northeast of Highway 31 and 7, and North of the South county line of Ripley and Dearborn Counties will constitute the Southern area.

**Eastern Area**       All areas East of the Indiana-Ohio state line but west of Interstate 75, Highway 65 and Highway 15 will constitute the Eastern area.

    All work performed within the above described Zone 1 shall be paid mileage at the rate of twenty-five cents ($0.25) per mile per day.

Mileage shall be computed by the most direct route generated by Rand McNally Road Atlas or a computer generated internet map such as Mapquest.  Mileage will be paid at two (2) times the distance as measured from the boundary of the home area to the job site. This is to compensate for travel to and from the job each day.

**Zone 2 - Room & Per Diem**

Room & per diem shall be defined as all job locations outside (beyond) the boundaries of "Zone 1 - Mileage" as described above.

**Compensation will be provided as follows:**

**Room :**     A room will be provided at the Contractor's expense for each night the employee is required to stay out of town, with no more than two (2) employees per room.

**Per Diem:**     A per diem expense of fifteen dollars ($15.00) per day shall be paid for each day worked while out of town.

**Mileage:**     Mileage shall be computed as describe above and shall be paid only once a week so as to compensate for travel, when staying out of town, to and from the job site.

**Outside Local Union 669 Jurisdiction:**

No employee shall be required to work outside the boundaries of Local Union 669's home area.

**ARTICLE VIII**
**PENSION**

**Section 1.**     The Employer agrees to contribute monthly to the International Union of Painters and Allied Trades Union and Industry National Pension Fund at a rate set forth in this contract for all employees covered by this Agreement. The only agreement between the Employer and the Union regarding retirement for Employees covered by this Agreement is as follows:

**A.**     For the duration of this Agreement, and any renewals or extensions thereof, the Employer agrees to make payments to the IUPAT Union and Industry National Pension Fund for each employee covered by this Agreement.



**B.**     For each hour or portion thereof for which an employee receives pay, the Employer shall make the required contribution as per **ARTICLE VI, Sections 2. and 3.** to the above named Fund.

**C.**     For the purpose of this section, each hour paid for, including hours attributable to show up time, and other hours for which pay is received by the employee in accordance with this Agreement, shall be counted as hours for which contributions are payable.

**D.**     Contributions shall be paid on behalf of any employee starting with the employee's first day of employment in a job classification covered by this Agreement. Except for those employees who are classified as pre-apprentices elsewhere in this Agreement.

**E.**     The payments to the Pension Fund required above shall be payable to IUPAT Union and Industry National Pension Fund, which was established under an Agreement and Declaration of Trust April 1, 1967. The employer hereby agrees to be bound to and by the said Agreement and Declaration of Trust, as though he had actually signed the same. The payments

10

will be forwarded to the Pension Fund Administrator.

   **F.**    The Employer hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now serving, or will in the future serve, as Employer Trustees together with their successors. The Employer further agrees to be bound by all actions taken by the Trustees pursuant to the said Agreement and Declaration of Trust.

   **G.**    All contributions shall be made at such time and in such manner as the Trustees require, and the Trustees shall have the authority to have an independent Certified Public Accountant audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the Pension Fund.

   **H.**    If an Employer fails to make contributions to the Pension Fund within fifteen (15) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provisions thereof to the contrary notwithstanding, and the Employer shall be liable for all costs for collecting penalties as may be assessed by the Trustees. The Employer's liability for payment under this Section shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided or set forth elsewhere in this Agreement.

   **I.**    The Pension Plan adopted by the Trustees of said Pension Fund shall at times conform with the requirements of the International Revenue Code so as to enable the Employer at all times to treat contributions to the Pension Fund as a deduction for income tax purposes.

## ARTICLE IX
## APPRENTICESHIP

**Section 1.**    An employer of three (3) journeypersons is required to employ at least one (1) apprentice unless his or her right to train apprentices has been revoked by the local Apprenticeship and Training Committee. Every apprentice shall work under the supervision of a Journeyman. The ratio shall be one (1) apprentice to three (3) journeymen or a fraction thereof.

   Apprentices shall meet the requirements and standards set by the "Apprenticeship Committee". This Committee shall be composed of equal representation from the Union and the Employers.

   Apprentices for the painters, decorators, drywall tapers and finishers shall serve a four (4) year term. Apprentices must be accompanied by a journeyman when on a job. All apprentices shall attend school as required by the Apprenticeship Standards. Apprentices shall be graded every six (6) months and must successfully complete each grading period to advance to the next level.

**Section 2.**    Apprentice's wage rates shall be the percentages of the Journeymen's wages.

**Section 3.**    **Joint Apprenticeship and Training Fund**

   All Employers doing work within the jurisdiction of Local Union 669 are required to pay into the Chesterfield Apprenticeship and Training Trust Fund on all employees working for the Employer's firm, regardless of whether those employees are members of Local Union 669 or not.

11

Payments shall be made on a monthly basis, on forms provided by the Union and shall be paid by the fifteenth (15th) day of the month following the end of the reporting period.

**Section 4.**    The Chesterfield Apprenticeship and Training and Trust Fund will be administered by the Trustees and Officers per agreement of the Chesterfield Apprenticeship and Training Trust Fund Agreement.

## ARTICLE X
## LABOR-MANAGEMENT COOPERATION FUND

**Section 1.**    Commencing as of the effective date of this Agreement, and for the duration of this Agreement, and any renewals or extensions thereof, the Employer agrees to make payments to The Painters and Allied Trades Labor-Management Cooperation Fund ("Fund") for each employee covered by this Agreement, as follows:

**A.**    For each hour or portion thereof, for which an employee receives pay, the Employer shall make a contribution of five cents ($0.05) to the Fund.

**B.**    For the purpose of this Article, each hour paid for, including hours attributable to show up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

**C.**    Contributions shall be paid on behalf of any employees starting with the employee's first day of employment in a job classification covered by this Agreement. This includes, but is not limited to, apprentices, helpers, trainees and probationary employees.

**D.**    The Employer and Union signatory to this Agreement agree to be bound by and to the Agreement and Declaration of Trust, as amended from time to time, establishing the Fund.

**Section 2.**    The Employer hereby irrevocably designates as its representatives on the Board of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors.

**Section 3.**    All contributions shall be made at such time and in such manner as the Trustees require, and the Trustees may at any time conduct an audit in accordance with the Agreement and Declaration of Trust.

**Section 4.**    If an Employer fails to make contributions to the Fund within fifteen (15) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any provisions hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due, together with attorney fees and such penalties as may be assessed by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance for arbitration procedure or any "no-strike" clause which may be provided or set forth elsewhere in this Agreement.

## ARTICLE XI
## SAFETY

In accordance with the requirements of the Occupational Safety and Health Act of 1970, it shall be the exclusive responsibility of the Employer to ensure the safety of the employees and compliance by them with any safety rules contained herein or established by the Employer. Nothing in this agreement will make the Union liable to any employees or to any other persons in the event that work related disease, sickness, death, injury, or accident occurs.

The Employer shall provide, at no cost to the employees, all necessary personal protective equipment and instructions on proper use of such equipment. The Employer shall provide for the proper maintenance and cleaning of all necessary personal protective equipment. If at any time, in the opinion of an employee, such personal protective equipment is defective, has not been properly maintained, or is not the appropriate personal protective equipment under the particular working conditions, the employee has the right to refuse to work with such equipment. No employee shall be dismissed, disciplined, or otherwise discriminated against, nor shall his pay be withheld for refusal to work with such defective, improperly maintained, inappropriate, personal protective equipment. The employee shall immediately report to the Employer such defective, improperly maintained, or inappropriate personal protective equipment.

## ARTICLE XII
## HEALTH AND WELFARE

The Employer agrees to contribute the amount set forth in this agreement to the proper Health & Welfare Fund in accordance with this agreement.

The Employer, for and in consideration of the provisions of Council of The Indiana State Council of Roofers Health and Welfare Fund (herein called the Health and Welfare Plan) providing benefits to eligible employees hereby agree to accept and be bound by and to comply with the terms and provisions of the Agreement and Declaration of Trust establishing the Indiana State Council of Roofers Health and Welfare Fund as adopted on April 1, 1997 as amended from time to time, and the Health and Welfare Contributions section of the Unions Collective Bargaining Agreement or Agreements establishing and/or containing said Plan.

It is intended that this participation Agreement required by the Labor Management Act of 1947, as amended, to permit the Indiana State Council of Roofers Health and Welfare Fund to receive contribution from the employer on behalf of the employees of the Employer. This employer ratifies the selection of and accepts as its representatives the present employer trustees of the Indiana State Council of Roofers Health and Welfare Trust and their successors in office from time to time. Contributions to the Indiana State Council of Roofers Health and Welfare Fund will be made by this Employer as required by the Agreement and Declaration of Trust establishing such plan and the Union's present and/or future Collective Bargaining Agreement, at the rate and in the manner prescribed in the Declaration of Trust and the Collective Bargaining Agreement as entered into by this employer or by an enmity representing such employer with the Indiana State Council of Roofers Health and Welfare Fund.

Such contributions shall continue for the period provided in such Agreement, including all amendments, supplements, modifications, extensions, renewals or successor Agreements therein.

It is further understood that the hourly rate of contribution may change from time to time as may be provided by the Collective Bargaining Agreement now in effect and/or any further Collective Bargaining Agreement which may from time to time be negotiated.

In the event a new Painters Health and Welfare Fund is established through the affiliated Local Unions of District Council 91, it shall not be a violation of this Agreement to proceed into a participation agreement with the newly established fund. This Article will be amended accordingly if new or different language is required.

## ARTICLE XIII
## WAGE AND FRINGE BENEFIT DELINQUENCY

In the event that the Union determines that any Employer has failed to pay into any of the fringe benefit funds, which is due by the fifteenth (15th) of the following month, a ten per cent (10%) penalty shall be assessed and compounded monthly to an Employer who fails to make his monthly payments and/or has failed to make sufficient funds in the bank to meet all paychecks issued to members or the Union, the Union shall have the right to immediately withhold and withdraw the services of its members from such Employer. If an Employer fails to make payment or furnish proof of payment to an authorized Union representative the Union may at its option remove the employees from the job and picket the Employer for nonpayment of funds.

## ARTICLE XIV
## INSURANCE COVERAGE

**Section 1.**    The Employer shall agree to carry Worker's Compensation Insurance with a company authorized to do business in the State and contribute to the State Employment Security Division for the purpose of unemployment insurance, irrespective of the number of employees employed. The Employer shall furnish satisfactory proof of such coverage and contributions to Local Union 669.

**Section 2.**    A Certificate of Insurance, a Guaranteed Wage and Fringe Benefit Surety Bond, or an Escrow Agreement, or a Letter of Credit, or a weekly payment agreement and a Memorandum of Agreement or Memorandum of Understanding must be signed before a contractor can start work.

   **A.**    If any Employer fails to pay fringe benefits, the Union shall be entitled to resort to all legal and economic remedies, including the right to strike and picket until such failure to pay has been corrected.

## ARTICLE XV
## BONDING REQUIREMENTS

**Section 1.**    In order to secure payment of wages, fringe benefits and deductions payable under this Agreement and under any other Agreement requiring a similar security arrangement as

14

identified herein which the Employer or Contractor has with a Local Union affiliated with District Council 91, each Employer or Contractor upon becoming a signatory contractor to this Agreement shall in one of the following ways post security with and in the name of District Council 91 of the International Union of Painters and Allied Trades, AFL-CIO, CLC, and its affiliated Local Unions:

    **A.**    By means of a surety bond in the sum of twenty-five thousand dollars ($25,000) underwritten by a surety company acceptable to District Council 91. Such a bond shall utilize the form furnished by the Union for this Agreement, unless the Union otherwise agrees in writing.

    **B.**    By means of a cash deposit in the sum of twenty-five thousand dollars ($25,000) with a bank or trust company acceptable to District Council 91 provided through an escrow agreement binding such deposit to the payment of wages, fringe benefits and deductions, and any later payment penalties thereto. The Employer or Contractor so depositing such funds shall be entitled to all interest earned by said deposit. The escrow agreement shall utilize the form which is attached to this Agreement and shall be with the escrow agent selected by District Council 91, unless the Union otherwise agrees in writing.

    **C.**    By means of an irrevocable letter of credit with a value of twenty-five thousand dollars ($25,000) with a bank acceptable to District Council 91 with said letter of credit naming the Union as beneficiary. A sight draft shall be drawn on the letter of credit when District Council 91 presents a written statement to the bank stating the amount of unpaid wages, fringe benefits, deductions and any late payment fees thereto. The irrevocable letter of credit shall utilize the form furnished by the Union for this Agreement, unless District Council 91 otherwise agrees in writing.

    **D.**    In those cases in which a contractor cannot obtain the required bonding, the escrow deposit or secure an irrevocable letter of credit, the contractor may become signatory providing the contractor signs a Memorandum of Understanding agreeing to pay the fringe benefits weekly.

    **E.**    Language for the aforementioned bond, escrow agreement, irrevocable letter of credit and weekly payments have been agreed to and approved during negotiations.

**Section 2:**    A surety arrangement posted with District Council 91 (and any of its other affiliated local unions, to the extent that the surety arrangement is "District Council wide") meeting any one of the above requirements will be acceptable for the collection of unpaid wages, delinquent fringe benefits and delinquent deductions (and late fees, to the extent permitted by the particular security arrangement) owed for any work performed under this Agreement provided such surety arrangement can be minimally applied to the delinquent principal amounts (wages, fringe benefits and deductions) occurring under this Agreement. Separate or duplicate bonding will not be required when the Employer or Contractor works in any jurisdiction covered by District Council 91. Separate bonding, or its equivalent, may be required by an Agreement the Employer or Contractor may have with the International Union.

# ARTICLE XVI
## RESPONSIBILITY AND RIGHTS

Members who desire to advertise or in any way present himself as a contractor shall be required to sign this Agreement and comply with all provisions including regulations pertaining to this agreement. No member shall work on a piecework basis. Nothing in this agreement shall be construed as to prevent a member from contracting small jobs, not to exceed three hundred fifty dollars ($350.00) per job.

No member shall work for any individual, partnership, corporation or other organization that has not signed this Agreement or a Memorandum of Understanding to this Agreement, and complied with all conditions in this Agreement.

# ARTICLE XVII
## SUPPORT OF PRIMARY ACTIVITY

Employees covered by this Agreement shall have the right to respect any legal primary picket line validly established by a bona fied labor organization, and the Union party to this Agreement has the right to withdraw employees covered by this Agreement whenever the Employer party to the Agreement is involved in a legitimate primary labor dispute with any bona fied labor organization.

# ARTICLE XVIII
## GRIEVANCE PROCEDURE
## AND JOINT TRADE BOARD AUTHORITY

**Section 1.    Grievance.**

   **A.**    In the event a dispute arises over the interpretation of any clause in this Agreement, or a grievance arises as to the application of this Agreement, the parties involved shall first make every effort to settle the dispute.

   **B.**    All parties to this Agreement shall have the right to file a grievance.

   **C.**    In the event the Local Union's representative and the Employer's representative cannot resolve the grievance, either party may put the Grievance in writing, submitting one copy to the other party and a duplicate copy to both the Chairman and the Secretary of the Local Joint Trade Board.

**Section 2.    Local Joint Trade Board.**

   **A.**    There shall be a permanently constituted Local Joint Trade Board consisting of three members appointed by the Business Manager/Secretary Treasurer of District Council 91 and three members appointed by the Local contractors. In odd numbered years, the contractors in that Local Union's territorial jurisdiction shall appoint the Chairman of the Local Joint Trade Board and the Business Manager/Secretary Treasurer shall appoint the Secretary of the Local Joint Trade Board. In even numbered years, the offices shall be reversed although, by joint

16

agreement, the parties may decide not to alternate offices. In the event that either or both the Chairman or Secretary are the griever or grieved party of the grievance submitted to the Local Joint Trade Board, then, a Chairman pro tem and/or a Secretary pro tem, as the case may be, shall fill the office for that particular grievance only. Neither the Union representative who filed/responded to the verbal grievance nor the Employer representative who filed/responded to the verbal grievance shall serve as a member of the Local Joint Trade Board hearing the submitted written grievance. No Employee shall sit as a member of the Trade Board on any case when he or his Employer is involved, either directly or indirectly, nor shall any Employer signatory to this Agreement act as a member of the Trade Board on any case when he or one of his employees is directly or indirectly involved.

B.    In order for a grievance to be processed, all grievances will be made in writing to one of the full-time District Council Representatives within ten (10) working days of the occurrence of the problem that prompted the grievance or the grieving party became aware of the problem. No procedures adopted for the processing of grievances shall prevent District Council 91 itself from initiating a grievance if deemed necessary by the Business Manager/Secretary Treasurer.

C.    Upon receipt of the written grievance by the Local Joint Trade Board's Secretary, the Local Joint Trade Board shall conduct a hearing of the grievance at the next scheduled meeting of the Local Joint Trade Board (providing there is at least ten (10) days to prepare) or at an earlier date if deemed necessary at the discretion of the Local Joint Trade Board Chairman or Secretary. The Secretary shall forward a copy of the grievance to the Business Manager/Secretary Treasurer of District Council 91 and to the contractors' appointed officer on the Area-Wide Joint Trade Board, as detailed below. The Local Joint Trade Board Chairman shall chair the hearing. The Local Joint Trade Board's Secretary shall take the notes of the hearing, retain copies of any documents submitted to the Local Joint Trade Board and shall prepare the decision.

D.    The Local Joint Trade Board shall reach its decision within three (3) business days after the hearing and shall mail by certified mail, return receipt requested, a copy of the decision to the grieving/grieved Union representative and grieving/grieved Employer representative within five (5) business days of the hearing. A copy of the decision shall also be sent to the Business Manager/Secretary Treasurer of District Council 91 and to the contractor Officer of the Area-Wide Joint Trade Board.

E.    In case any of the members of the Local Joint Trade Board are disqualified from sitting as Board members due to participation in the verbal grievance then the remaining Board members for each group (Union/Employer) may either proceed with its two (2) remaining members or may appoint its own replacement for the disqualified individual. Whatever decision is made with respect to replacing a disqualified Board member, each group shall still have a full complement of three (3) votes to exercise. A quorum shall exist for the hearing so long as at least one (1) Union and one Employer Board member are in attendance at the hearing. For illustration purposes only, if the Union has only one (1) Board member in attendance such individual shall have three (3) votes. If the contractors have two (2) Board members in attendance at the hearing, each contractor member shall have one and one-half (1 ½) votes.

F.    In the event a hearing is not conducted at the next scheduled or special meeting after submission of the written grievance to the Local Joint Trade Board, or if there is no quorum

17

at the scheduled or special Local Joint Trade Board hearing, or if the Local Joint Trade Board deadlocks on the written grievance, then the grieving party may automatically refer the grievance to the District Council 91 Area-Wide Joint Trade Board by submitting a letter referring the grievance to the District Council 91 Area-Wide Joint Trade Board.

**Section 3.    District Council 91 Area-Wide Joint Trade Board a/k/a Area-Wide Joint Trade Board**

    **A.**    There will be a permanently established District Council 91 Area-Wide Joint Trade Board which shall be composed of the District Council 91 Business Manager/Secretary Treasurer and the appointee of the contractor Officers of all of the Local Joint Trade Boards which wish to participate in the selection process of the contractor officer of the Area-Wide Joint Trade Board. Additionally, the Business Manager/Secretary Treasurer shall appoint a representative from each Local Union affiliated with the District Council and each Local Union's counterpart territorial contractors shall each be entitled to appoint one member to the District Council 91 Area-Wide Joint Trade Board.

    **B.**    District Council 91's Business Manager/Secretary Treasurer and the Area-Wide Joint Trade Board Employers' selected member officer shall serve as Secretary and Chairman, respectively, and shall alternate offices each year, if one (1) or both of such individuals so requests. In the event that the Area-Wide Employer officer is the grieving/grieved party with respect to the grievance to be heard then an alternate shall be selected by those Employers' Area-Wide Joint Trade Board members who are in attendance at the hearing.

    **C.**    Once a grievance is referred to the District Council Area-Wide Joint Trade Board for any of the reasons set forth in **Section 2., F.,** a hearing shall be scheduled as soon as possible by the Area-Wide Joint Trade Board's officers.

    **D.**    Neither the members of the Local Joint Trade Board from which the grievance is submitted nor any members of the Local Trade Board in which the grieving/grieved Employer has its principal office shall sit on the Area-Wide Joint Trade Board for that particular grievance.

    **E.**    A quorum for the District Council 91 Area-Wide Joint Trade Board shall consist of a minimum of three (3) Employer members and three (3) Union members. Whichever side (Union or Employer) has the most members at the hearing shall have that number be its total vote, with each member having one vote. The side having the lesser number of members present shall have the same total number of votes which shall be allocated among its members present to ensure that an equal number of votes are being cast. For example, if ten (10) Employer members are present and five (5) Union members are present then each Employer member shall have one (1) vote and each Union member shall have two (2) votes.

    **F.**    The Area-Wide Joint Trade Board shall reach its decision by no later than three (3) days after the hearing and shall mail the decision by certified mail, return receipt requested to the grieving and grieved parties as soon as reasonably possible thereafter.

    **G.**    In the event of a deadlock by the Area-Wide Joint Trade Board, the grieving party shall have fifteen (15) days to notify the officers of the Area-Wide Joint Trade Board of its desire to proceed to arbitration. The officers shall then work with the grieving and grieved party on mutually selecting an Arbitrator within seven (7) days after the referral to Arbitration. If the

parties are unable to mutually select an Arbitrator, then they shall contact the Federal Mediation and Conciliation Service to obtain a panel of at least seven (7) nationally recognized arbitrators from which an Arbitrator shall be selected.

 **H.** The Arbitrator may consider only the particular issue or issues presented to him in the written grievance. The authority of the Arbitrator is strictly limited to the interpretation or application of the existing terms of this Agreement and any amendments and addenda, thereto.

**Section 4.** **Authority of the Local and Area-Wide Joint Trade Boards**

 **A.** The Local Joint Trade Board shall hold regular monthly meetings, or shall meet at any time deemed necessary by one or both of its officers and shall meet to conduct grievance hearings as detailed above. The Area-Wide Joint Trade Board shall meet as deemed necessary by the Business Manager/Secretary Treasurer and or the Contractor Officer.

 **B.** Each Joint Trade Board is authorized to impose fines and to issue directives against a party held to have violated this collective bargaining agreement.

 **C.** Each Joint Trade Board is authorized to request and to receive whatever records are necessary to resolve the grievance being heard and to call before them all parties concerned.

 **D.** Any failure to supply documentation or to produce a witness deemed necessary by each Joint Trade Board shall be the basis for denying or granting the grievance as the case may be.

 **E.** Fines assessed as part of a Joint Trade Board decision may be directed to be paid to charitable organizations or another mutually agreed upon entity including but not limited to the Local or Area-Wide Joint Trade Boards.

 **F** Expenses and fees of arbitration shall be shared equally by the parties.

**Section 5.** **General Principles**

 **A.** The decisions of the Local and Area-Wide Joint Trade Boards as well as by an Arbitrator shall be final and binding on all persons and entities seeking to enforce rights and obligations created by the particular parties' collective bargaining agreement.

 **B.** There shall be no strikes or lockouts during the terms of this Agreement, except with respect to a party which has failed to cooperate in the grievance process or to abide by a decision of the Local or Area-Wide Joint Trade Board and with respect to an Employer's failure to pay the required contractual wages, fringe benefits and deductions.

 **C.** All actions and decisions taken by each Local Joint Trade Board and by the Area-Wide Joint Trade Board and their members shall be made as a Joint Board. No individual representative and/or officer shall have any personal liability for serving in such position.

 **D.** Each Joint Trade Board shall set up a financial budget, keep accurate records of all income and expenditures and be entitled to employ any professionals deemed necessary to aid in its consideration of a grievance.

**E.**     All expenditures made by the Joint Trade Board shall be limited to costs incurred in the administration of this Agreement and the general promotion of the industries covered by this Agreement.

**F.**     A party's utilization or failure to utilize the procedures set forth in this Article shall not interfere with any legal rights otherwise available to the ERISA Funds identified in this Agreement.

**Section 6.     Guiding Principles**

**A.**     It is agreed that it is unfair for any person to be bound by the terms of this Agreement unless all other persons hereto observe likewise.

**B.**     It is recognized that it would constitute unfair competition for any Employer to observe the wages and working conditions agreed upon while its competitor ignored wages and conditions.

**C.**     It is further recognized that signatory contractors and the Union owe their very existence to the principles embodied in this Agreement and to the furtherance of harmonious relations between signatory contractors and the Union.

**Section 7.   Additional Authority**

**A.**     The Local Joint Trade Boards and the Area-Wide Joint Trade Board may consider and recommend amendments and addenda to the collective bargaining agreements during their terms.  Such recommendations shall be subject to ratification by the negotiating parties in order to be implemented.

**ARTICLE XIX**
**DUES CHECK-OFF**

**Section 1.**     Every employer signatory to this Agreement hereby agrees to check-off from wages of any employee employed by such Employer during the term of this Agreement, administrative dues in the amount specified in the Union's by-laws and to remit said amount to the Union in the following manner:

**A.**     The Union will notify the Employer in writing of the amount of administrative dues specified in the by-laws, and will submit to the Employer a copy of the by-laws or the applicable by-law provision.

**B.**     For each payroll period, the Employer will deduct from the wages of each employee the amount specified in the by-laws during said payroll period, and will accumulate said deductions to the end of the month.

**C.**     On or before the fifteenth (15th) day of each month, the Employer will remit to the Union the entire amount of administrative dues due and owing as to each employee for the month previous, together with a list of employees covered hereby and the amount of hours and

gross pay worked by each during the applicable period.

**Section 2.**     When a Signatory Employer performs a job within the jurisdiction of a union affiliated with the IUPAT other than the Union signatory hereto and the by-laws of that other union contain a provision for administrative dues or Business Representative "Assessment", the employer shall check-off from the wages of employees covered by this Agreement and employed on that job administrative dues or Business Representative/Business Manager "Assessment" in the amount stated in that other union's by-laws, and shall remit said amount to that other union. In that event, that other union shall be acting as agent of the signatory union for the purpose of policing and administering this Agreement. In performing the check-off, the procedure specified in **Section 1., A.-C.**, will be followed, except that it shall be the responsibility of said other union to notify the Employer in writing of the amount of administrative dues or Business Representative/Business Manager "Assessment" specified in its by-laws and to submit to the Employer a copy of the by-laws or the applicable by-law provision. When the signatory Employer performs a job within the jurisdiction of a Union affiliated with the IUPAT other than the Union signatory hereto, and the by-laws of that other union contain no provisions for administrative dues or Business Representative/Business Manager "Assessment", the Employer shall continue to be bound by **Section 1.**

**Section 3.**     The obligation of the Employer under **Section 1 and 2** shall apply only as to employees who have voluntarily signed a "Dues Deduction Authorization Card."

**Section 4.**     At the time of the employment of any employee, the Employer will submit to each employee for his voluntary signature a "Dues Deduction Authorization Card" in triplicate, one (1) copy of which is retained by the employer, one (1) copy retained by the employee, and the other returned to the Union, the form to be supplied such Employer by the Union.

**Section 5.**     On or before the tenth (10th) day of each month, the Employer will submit to the Union a list of all employees covered by the Agreement who have not signed a "Dues Deduction Authorization Card" together with the number of hours worked by each such employee during the month previous.

## ARTICLE XX
## SUPREMACY CLAUSE

The Employer agrees not to enter into any agreement or contract with his or her employees, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement. Any such agreement shall be null and void.

## ARTICLE XXI
## GENERAL SAVINGS CLAUSE

If any Article or Section of this Agreement should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any Article or Section should be restrained by such tribunal pending a final determination as to its validity, the remainder of this Agreement or the application of such Articles or Sections to persons or circumstances other than those as to which it has been held invalid or as to which compliance with enforcement of has been restrained, shall not be affected thereby.

21

In the event that any Article or Section is held invalid or enforcement of or compliance with any Article or Section has been restrained, as above set forth, the affected parties shall meet at the request of the Union, for the purpose of arriving at a mutually satisfactory replacement for such Article or Section during the period of invalidity or restraint. If the parties do not agree on a mutually satisfactory replacement within sixty (60) days after beginning of the period of invalidity or restraint, either party shall be permitted all legal or economic recourse in support of its demands notwithstanding any provision in this Agreement to the contrary.

## ARTICLE XXII
## JOINT APPRENTICESHIP AND TRAINING FUND
### (IUPAT JATF)

**Section 1.**      The Employer and the Union hereby establishes/maintain an Apprenticeship and Training Fund to be known as the "Chesterfield Joint Apprenticeship and Training Fund", (hereinafter referred to as the Apprenticeship and Training Fund) under a Trust Agreement.

**A.**      Commencing with the first day of April, 1997, and for the duration of this Agreement, and any extensions or renewals thereof, the Employer, as defined in the Agreement and Declaration of Trust executed by and between the International Union of Painters and Allied Trades Local Union 669, and the Employer signatory hereto, agrees to make payments to the Chesterfield Joint Apprenticeship and Training Fund for each employee covered by this Agreement as follows:

**B.**      For each hour or portion thereof, for which an employee receives pay, the Employer shall make a contribution as defined in **ARTICLE VI, Section 2.**, of this Agreement to the above named Apprenticeship and Training Fund.

**C.**      Contributions shall be paid on behalf of any employee starting with the employee's first hour of employment in a job classification covered by this Agreement. This includes, but is not limited to apprentices, journeymen, and probationary employees.

**D.**      The payments to the Apprenticeship and Training Fund required above shall be made to the Chesterfield Joint Apprenticeship and Training Fund which was established under an Agreement and Declaration of Trust, dated April 1, 1997. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as though he had actually signed the same.

**E.**      From the funds collected in the above manner, the Trustees of the Chesterfield Joint Apprenticeship and Training Fund shall hold in trust the sum of five cents ($0.05) per hour for each hour or portion thereof for which an employee receives pay, and remit said sum to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT JATF). The payments shall be made at such regular periods of time and in such manner and form as shall be determined by the Trustees of the International Fund.

**F.**      The payments to the International Fund required in **Paragraph E.** above shall be made to the IUPAT JATF, which was established under an Agreement and Declaration of Trust dated May 1, 1995. The Employer hereby agrees to be bound by and to the said Agreement and Declaration of Trust, as though he had actually signed the same.

G.     The Employer hereby irrevocably designates as its representatives on the Board of Trustees of the IUPAT JATF, such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors, as provided for in the aforesaid Trust Indenture.

H.     The Union hereby irrevocably designates as its representatives on the Board of Trustees of the IUPAT JATF, such Trustees as are now serving, or who will in the future serve, as Union Trustees, together with their successors, as provided for in the aforesaid Trust Indenture.

I.     The parties hereto further agree to be bound by all action taken by the Trustees of the IUPAT JATF pursuant to the said Agreement and Declaration of Trust.

**Section 2.**     All contributions shall be made at such time and in such manner as the Trustees require; and the Trustees shall have the authority to have a Certified Public Accountant audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the Apprenticeship Fund.

**Section 3.**     If an Employer fails to make contributions to the Chesterfield Joint Apprenticeship and Training Fund in twenty (20) days after the date required by the Trustees, such failure shall be deemed a violation of said Agreement, and the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any provisions hereof to the contrary notwithstanding, and the Employers shall be liable for all costs of collecting the payments together with attorney fees and such penalties as may be assessed by the Trustees.  The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided or set forth elsewhere in this Agreement.

**Section 4.**     The Apprenticeship Plan adopted by the Trustees of said Apprenticeship Funds shall at all times conform with the requirements of the Internal Revenue Code and other applicable laws and regulations so as to enable to Employer at all times treat contributions to the Apprenticeship Fund as a deduction for income tax purpose.

### ARTICLE XXIII
### JOURNEYMAN TRAINING/UPGRADE

All members shall have obtained:

A.     OSHA 10 Certification by January 1, 2004
B.     CPR Certification by April 1, 2004

A member that does not obtain their Certification will not receive their next pay raise until Certification has been completed.

### ARTICLE XXIV
### DRUG POLICY

The Employer may implement reasonable rules regarding drug and alcohol testing which are non-discriminatory and uniformly enforced.

23

**ARTICLE XXV**
**DURATION CLAUSE**

**Section 1.**      This Agreement shall be in full force and effect from April 1, 2003 to and including March 31, 2006 and shall continue from year to year thereafter unless written notice of desire to cancel or terminate the Agreement is served by either party upon the other not less than sixty (60) and not more than ninety (90) days prior to March 31, 2006 of any subsequent contract year.

**Section 2.**      Where no such cancellation or termination notice is served and the parties desire to negotiate changes or revisions in this Agreement, either party may serve upon the other a written notice not less than sixty (60) and not more than ninety (90) days, prior to March 31, 2006 of any subsequent contract year, advising that such party desires to revise or change terms or conditions of such Agreement..  The respective parties shall be permitted all legal or economic recourse to support their requests for revisions if the parties fail to agree thereon.  Nothing herein shall preclude the parties from making revisions or changes in this Agreement, by mutual consent, at any time during its term.

**Section 3.**      Two original, jointly signed and sealed, Memorandums of Agreement are to be signed by the Employer and the District Council 91 Business Representative from Local Union 669 for this Agreement to be valid.  One original of the Memorandum of Agreement will be retained by the Employer and the other original Memorandum of Agreement will be retained by the Union.

# DISTRICT COUNCIL 91, LOCAL UNION 669
## MEMORANDUM OF AGREEMENT

THIS AGREEMENT made and entered into by and between _Odle, Inc._
_____ ("EMPLOYER") and Painters Local Union 669, affiliated with District Council 91 of the International Union of Painters and Allied Trades, AFL-CIO, CLC ("UNION").

In consideration of the mutual promises of each other, the parties hereby AGREE as follows:

1. The EMPLOYER recognizes the UNION as the sole and exclusive bargaining representative for and on behalf of the employees of the EMPLOYER now or hereafter employed within the territorial and occupational jurisdiction of the UNION.

2. The parties do hereby adopt the UNION'S latest Agreement, and all approved Amendments between the Chesterfield and Vicinity Signatory Painting Contractors and Painters Local Union 669, affiliated with District Council 91 of the International Union of Painters and Allied Trades, AFL-CIO, CLC, or their successors, and agree to be bound by all the terms and conditions thereof for the duration of such Agreement and for the period of any subsequent extensions, including any amendments which may be subsequently made, and any subsequent agreements, unless either party serves written notice upon the other at least sixty (60) days and no more than ninety (90) days prior to the stated expiration date in the Agreement, or to any subsequent expiration date, of a desire to terminate this Memorandum of Agreement.

3. The parties agree to be bound by the terms and conditions of any Trust Fund Agreements identified in aforesaid Agreement and amendments thereof, accepting and ratifying the appointment of the Employer Trustees and their successors for the aforesaid period.

4. This Agreement shall become effective upon the date shown below.

5. The EMPLOYER acknowledges the receipt of the UNION'S latest Agreement and all approved amendments and the applicable Trust Agreements.

IN WITNESS WHEREOF, the parties have executed this Memorandum of Agreement and made effective the _28TH_ day of _April_ 20_03_.

FOR THE COMPANY

_Odle, Inc._
Company Name
Signed _[signature]_
Title _President_
Print Name _John S. Linder_
Address _2560 W. Kilgore Ave._
City _Muncie, IN 47304_
Phone ( _765_ ) _288-3611_
Fax ( _765_ ) _288-7673_
Insurance Co. _Amerisure_
Agreements/Negotiations/Neg 669/LU 669 MOA 032003

FOR THE UNION

**PAINTERS LOCAL UNION 669,**
PO Box 42
Chesterfield, Indiana 46017
Phone   765-378-5242   Fax   765-378-0486
affiliated with
**DISTRICT COUNCIL 91,** of the
**International Union of Painters**
**and Allied Trades AFL-CIO, CLC**
409 Millner Industrial Drive
Evansville, Indiana 47710
Phone   812-962-9191   Fax   812-425-4890
(seal)
Signed _Everett Sides_
Title _Business Representative_
Print Name _Everett Sides_



OFFICE OF GARY J. MEYERS, FUND ADMINISTRATOR    202 | 783 | 4884    FAX 202 | 393 | 6475
UNITED UNIONS BUILDING • 1750 NEW YORK AVENUE, N.W. • SUITE 501 • WASHINGTON, DC  20006-5301

December 21, 2005

*Pam company restructured and incorporated actual name is Oxford Painting Co.*

Oxford Painting, ~~LLC~~ CO.
615 Bundy Court
New Castle, IN  47362

Re:   Request for Information
      Reporting Business:       **Oxford Painting Company, LLC**
      Fund Account No.:         **Code: O-2807/669**

*fed IP
20-3072860
all cont. hist stays.
2/24/0
vm*

Dear Employer:

We have become aware of a transaction, name change or other change
of circumstances with possible withdrawal liability consequences with
respect to this account.  In order to allow the Trustees of the International
Painters & Allied Trades Industry Pension Fund (jointly "Pension Fund"),
to perform their statutory duties, we accordingly ask that you and all
trades or businesses under common control complete and return the
enclosed questionnaire within 30 days pursuant to 29 U.S.C. §1399(a).
The Trustees have found the Questionnaire and requested documents to
be necessary to enable the Fund to comply with the requirements of
federal law.  The Pension Fund will assume that the answers would be
adverse to your interest and proceed accordingly in the absence of a
timely response.

We encourage you to provide federal income tax returns (with financial
information deleted), Securities & Exchange Commission filings and
similar materials to shorten the answering process.  Your cooperation will
be appreciated and help us all avoid unnecessary expense.

Sincerely,

*Gary J. Meyers*                    *47*

GARY J. MEYERS                      *80*
Administrator
For the Trustees                    *669*

Enclosure

*Ad FI # 35-2088309*



# INTERNATIONAL PAINTERS AND ALLIED TRADES COMBINED FUNDS
UNITED UNIONS BUILDING, 1750 NEW YORK AVENUE, N.W. SUITE #501
WASHINGTON, D.C. 20006-5301   PHONE 202-783-4884   FAX 202-393-6475

**REMITTANCE REPORT**

PLEASE CHECK APPROPRIATE BOX

☐ NO FURTHER WORK - FINAL REPORT
☐ NO EMPLOYEES COVERED

REPORT MUST BE SIGNED AND
RETURNED EVEN IF NO
PARTICIPANTS ARE WORKING

Contributions should be submitted
only on behalf of eligible employees.
See reverse side for explanation.

*Change of F.I.D No*

$ 2.70 IUPAT Industry Pension Plan
$ 2.70 Total IUPAT Combined Funds

| CALCULATION OF CONTRIBUTION | (8) TOTAL HOURS | 308 | MAKE CHECK PAYABLE TO: IUPAT COMBINED FUNDS |
|---|---|---|---|
| | (9) AT RATE OF | $2.70/HOUR | |
| (10) TOTAL IUPAT CONTRIBUTION | | 831.60 | ← SUBMIT THIS AMOUNT |

COVERING PAYROLL PERIODS FROM *Jan 05* THROUGH *31 Jan 05*

WE WARRANT THIS REPORT TO BE TRUE AND CORRECT AND IN AGREEMENT WITH OUR PAYROLL RECORDS.

PREPARED BY ⇨   DATE ⇨ *28 Feb 05*   PHONE ⇨ *765 521 3444*   FAX ⇨ *765 295 3491*

EMPLOYER CODE: 0 2807   D.C./LOCAL UNION: 000669   JAN 2005
OXFORD PAINTING COMPANY LLC
~~762 HICKORY LANE~~ 615 Bundy Court
NEW CASTLE   IN 47362
FED-ID# ~~35-2090309~~ 20-1495525

**FRINGE BENEFIT**
SEE BACK PAGE
BLUE COPY

| SOCIAL SECURITY NUMBER | EMPLOYEES NAME | TOTAL HOURS PAID | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| 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 | BRYAN ALLEN ELDER | | | | | |
| 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 | MICHAEL WARREN HOWARD | | | | | |
| 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 | MICHAEL J. RILEY | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | ENTD MAR 7 2005 G | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

COMPLETE INSTRUCTIONS ARE ON THE REVERSE SIDE

EMPLOYER RETAIN BLUE COPY

# OXFORD Painting, LLC
969 Hickory Lane
New Castle, IN 47362

Monthly Benefits Report
Month Beginning 1 Jan 2005 End 31 Jan 2005

Prepared by ___Terry S. Crawford___

## Report for Local 669

| SSAN | Employee Name | Home Local | Scale | Total Hours | hrs in 669 | hrs in 47 | Gross in 669 | Appr Fund | H & W | Pension | 669 ck off |
|------|---------------|-----------|-------|-------------|-----------|----------|--------------|-----------|-------|---------|-----------|
| 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 | Michael W. Howard | 669 | 20.2 | 156 | 156 | 0 | 3,151.2 | 37.44 | 628.68 | 421.2 | 94.54 |
| 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 | Scott L. Crist | 669 | 18.67 | 152 | 152 | 0 | 2,837.84 | 36.48 | 612.56 | 410.4 | 85.14 |
| 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 | Terry S. Crawford - Feb / Mar | | | | | | | | | | |
| Totals for 669 | | | | 308 | 308 | 0 | 5,989.04 | 73.92 | 2,319.92 | 831.6 | 179.67 |

1,078.68

# OXFORD Painting, LLC
969 Hickory Lane
New Castle, IN 47362

Monthly Benefits Report
Month Beginning 1 Jan 2005 Ending 31 Jan 2005

Prepared by ___Terry S. Crawford___

## Report for Local 47

| SSAN | Employee Name | Home Local | Scale | Total Hours | hrs in 669 | hrs in 47 | Gross in 669 | Gross in 47 | 47 check off | Appr | H & W | Pension | IUCRC |
|------|---------------|-----------|-------|-------------|-----------|----------|--------------|-------------|--------------|------|-------|---------|-------|
| 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 | Mike L. Brown | 47 | 23.59 | 155 | 0 | 155 | 0 | 3,656.45 | 109.69 | 40.3 | 768.8 | 590.55 | 10.85 |
| 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 | Phillip Burton | 47 | 21.59 | 155 | 0 | 155 | 0 | 3,346.45 | 100.39 | 40.3 | 768.8 | 590.55 | 10.85 |
| 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 | Paul Bartholomew | 47 | 21.59 | 56 | 0 | 56 | 0 | 1,209.04 | 36.27 | 14.56 | 277.76 | 213.56 | 3.92 |
| Totals for 47 | | | | 366 | 0 | 366 | 0 | 8,211.94 | 246.36 | 95.16 | 1,815.36 | 1,394.46 | 25.62 |

ENTD MAR 7 2005 G

## DISTRICT COUNCIL 91, LOCAL UNION 669
## MEMORANDUM OF AGREEMENT

THIS AGREEMENT made and entered into by and between _OXFORD PAINTING COMPANY, LLC_ ("EMPLOYER") and Painters Local Union 669, affiliated with District Council 91 of the International Union of Painters and Allied Trades, AFL-CIO, CLC ("UNION").

In consideration of the mutual promises of each other, the parties hereby AGREE as follows:

1. The EMPLOYER recognizes the UNION as the sole and exclusive bargaining representative for and on behalf of the employees of the EMPLOYER now or hereafter employed within the territorial and occupational jurisdiction of the UNION.

2. The parties do hereby adopt the UNION'S latest Agreement, and all approved Amendments between the Chesterfield and Vicinity Signatory Painting Contractors and Painters Local Union 669, affiliated with District Council 91 of the International Union of Painters and Allied Trades, AFL-CIO, CLC, or their successors, and agree to be bound by all the terms and conditions thereof for the duration of such Agreement and for the period of any subsequent extensions, including any amendments which may be subsequently made, and any subsequent agreements, unless either party serves written notice upon the other at least sixty (60) days and no more than ninety (90) days prior to the stated expiration date in the Agreement, or to any subsequent expiration date, of a desire to terminate this Memorandum of Agreement.

3. The parties agree to be bound by the terms and conditions of any Trust Fund Agreements identified in aforesaid Agreement and amendments thereof, accepting and ratifying the appointment of the Employer Trustees and their successors for the aforesaid period.

4. This Agreement shall become effective upon the date shown below.

5. The EMPLOYER acknowledges the receipt of the UNION'S latest Agreement and all approved amendments and the applicable Trust Agreements.

IN WITNESS WHEREOF, the parties have executed this Memorandum of Agreement and made effective the _15th_ day of _APRIL_ 20_03_.

FOR THE COMPANY

_OXFORD PAINTING COMPANY LLC_
Company Name

Signed _____

Title _MANAGING MEMBER_

Print Name _TERRY S. CRAWFORD_

Address _969 HICKORY LANE_

City _NEW CASTLE, IN 47362_

Phone _765-521-3444_

Fax _765-529-5347_

Insurance Co. _THE BOND DEPARTMENT_

Agreements/Negotiations/Neg 669/LU 669 MOA 032003

FOR THE UNION

**PAINTERS LOCAL UNION 669,**
PO Box 42
Chesterfield, Indiana 46017
Phone   765-378-5242   Fax   765-378-0486
affiliated with
**DISTRICT COUNCIL 91,** of the
**International Union of Painters
and Allied Trades AFL-CIO, CLC**
409 Millner Industrial Drive
Evansville, Indiana 47710
Phone  812-962-9191   Fax   812-425-4890
(seal)
Signed _Everett Sides_

Title   Business / Representative

Print Name   Everett Sides

**International Painters and Allied Trades Industry Pension Fund**

OFFICE OF GARY J. MEYERS, FUND ADMINISTRATOR    202 | 783 | 4884    FAX 202 | 393 | 6475
UNITED UNIONS BUILDING • 1750 NEW YORK AVENUE, N.W. • SUITE 501 • WASHINGTON, DC  20006-5301

November 2, 2005

Mr. Terry Crawford                                    Code: O-2807
Oxford Painting Company LLC                           LU #: 47/669
615 Bundy Court
New Castle, IN  47362

Dear Mr. Crawford:

Your company, Oxford Painting Company LLC (hereinafter "the Company"), is delinquent in contributions to the International Painters and Allied Trades Industry Pension Fund (hereinafter "the Fund") in principal of $10,077.75, and $276.65 in interest assessed through November 15, 2005 for the period of May 2005 through September 2005, for a total of $16,354.40.

Solely in consideration of the fact that if the Company is required to pay the full delinquency immediately it would endanger the financial stability of the Company, and hence the livelihood and pension credits and benefits of the participating employees, the Trustees of the Fund have agreed to permit you to follow the time payment plan outlined in this Promissory Note.

1.  The total principal amount as set forth above, and interest accruing, amortized at six (6%) percent per annum, must be paid in full no later than October 15, 2006.

2.  The principal and interest shall be paid at the rate of $1,407.56 **(to be overnighted)** per month, for 12 months, payable with each current remittance report submitted hereafter, or in any month in which a remittance report is not submitted, by the 15th of that month, until the entire debt has been paid.

3.  The attached worksheet, marked Exhibit A, and incorporated herein by reference as though fully written herein, sets forth the total principal debt including interest, the required monthly payments, and their respective due dates.  The Company agrees that Exhibit A represents the correct amounts owed this Fund.

4.  The Company agrees that current remittance reports for all Union jurisdictions will be filed and contributions paid in the manner and within the time required by the Trustees of this Fund.  If any further delinquency occurs from this date forward, either as to the debt previously incurred, or as to current payments, such delinquency will be deemed a breach of this agreement and the entire debt, including any amounts conditionally waived, will be due immediately.  In that event, appropriate action may be immediately undertaken by the Trustees of the Fund or the Local Union or District Council involved, in accordance with the terms of the applicable Collective Bargaining Agreement and with the Agreement and Declaration of Trust.



EXHIBIT

3

Oxford Painting Company LLC
November 2, 2005
Page Two

## Promissory Note

4.  For this agreement to take effect and if the Company agrees to these terms, <u>an authorized representative of the Company **must sign the agreement in the presence of a notary and return the original agreement by,**</u> November 15, 2005, **along with one of the following:** (1) a bond in the amount of the note, with the Pension Fund as the sole payee, (2) Assignment of Claims on a current job project, and proof of the assignment, (3) a **signed** personal guarantee, or (4) an irrevocable letter of credit from your bank.

5.  The first installment of $1,407.56 must reach the Fund Office no later than, November 15, 2005 along with the current reports and contributions as defined on "Exhibit A."

6.  Although the Fund Administrator, Gary J. Meyers, has signed this Promissory Note, the Company understands the terms of the Note are ineffective unless each item referenced in paragraph five is provided to the Fund Office.

Sincerely,

*Gary J. Meyers*

Fund Administrator

The undersigned warrants and represents that he or she is a duly authorized representative of the Company, with full authority to bind the Company to this agreement. The undersigned and the Company agree that the foregoing constitutes a binding agreement between the Fund and the Company.

Signature: _____
                                 Authorized Representative

Printed Name of Authorized Representative: TERRY CRAWFORD

Title: PRESIDENT

S.S.#: 306 74 2133

Company Name: OXFORD PAINTING CO.

Sworn and subscribed to before me on this ____ 15 NOV ____ day of, 2005.

_____
NOTARY PUBLIC

My commission expires 15 JUN 2011 .

Oxford Painting Company LLC
November 2, 2005
Page Three

## PERSONAL GUARANTEE
### Promissory Note

I, _TERRY CRAWFORD_____, have read and understand the foregoing agreement.  In consideration of the consent by the Fund to the agreement, I personally guarantee the payments that the Company has agreed to make, and agree as follows:

1.    If the Company fails to comply with the agreement at any time, I will pay all contributions, delinquencies, and amounts specified in the agreement, that the Company owes to the Fund, within ten (10) days after receipt of a written demand for payment by the Fund.  Delivery by first class mail to the following address shall be conclusive proof, though not the only means of proving my receipt of a written demand:

The address to which notice should be sent:

OXFORD PAINTING Co

615 BUNDY CT

NEW CASTLE, IN 47362

2.    The Fund may demand payment from me at any time after a failure of compliance by the Company with this agreement, and I waive any defense of un-timeliness or dilatoriness against a demand for payment by the Fund.

3.    If I fail to pay on the terms set out here, I shall be liable under the same terms, and to the same extent, as the Company and my liability shall include the contractual and statutory liabilities of the Company.

Signature:

Printed Name of Personal Guarantor:    TERRY CRAWFORD

Home Address of Personal Guarantor:    615 BUNDY CT

NEW CASTLE, IN 47362

Home Telephone Number of Personal Guarantor:    765 521 3444

Cell Phone # and Fax # of Personal Guarantor:    765-524-1170    765-529-5347

Relationship of Personal Guarantor to the Company:    PRESIDENT

Social Security Number of Personal Guarantor:    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

Sworn and subscribed to before me on this  15  day of  JuN , 200 5 .

_____
NOTARY PUBLIC

My commission expires  15 JuN 2011____.

Oxford Painting Company LLC
November 2, 2005
Page Four

# EXHIBIT A
## PROMISSORY NOTE

*NOTE:* *All installment payments and remittance reports and contributions under this Promissory Note Agreement must be* **overnighted** *directly to:*

IUPAT INDUSTRY PENSION FUND
1750 NEW YORK AVENUE, N.W., SUITE 501
WASHINGTON, DC  20006-5301

| Payment # | Amount Due | Current Reports, with Contributions Due | Date Due |
|---|---|---|---|
| 1. | $1,407.56 | October 2005 | November 15, 2005 |
| 2. | $1,407.56 | November 2005 | December 15, 2005 |
| 3. | $1,407.56 | December 2005 | January 15, 2006 |
| 4. | $1,407.56 | January 2006 | February 15, 2006 |
| 5. | $1,407.56 | February 2006 | March 15, 2006 |
| 6. | $1,407.56 | March 2006 | April 15, 2006 |
| 7. | $1,407.56 | April 2006 | May 15, 2006 |
| 8. | $1,407.56 | May 2006 | June 15, 2006 |
| 9. | $1,407.56 | June 2006 | July 15, 2006 |
| 10. | $1,407.56 | July 2006 | August 15, 2006 |
| 11. | $1,407.56 | August 2006 | September 15, 2006 |
| 12. | $1,407.56 | September 2006 | October 15, 2006 |

**\* As of now you also owe $2,794.70 for the delinquencies listed below.  Please remit by Next Day Service your payment with the signed Promissory Note, Personal Guarantee, October 2005 reports and contributions for both divisions and the first installment payment of $1,407.56 by November 15, 2005.**

| | |
|---|---|
| $  156.74 | Late charges |
| $  569.13 | LU669 report shortages for October 2004 and April 2005 |
| $2,068.83 | LU47 report shortages for October 2004, February 2005 and March 2005 |
| $2,794.70 | Total amount due |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

INTERNATIONAL PAINTERS AND ALLIED      )
TRADES INDUSTRY PENSION FUND           )
                                       )
                       Plaintiff       )        CIVIL ACTION NO.
        v.                             )        1:07-CV-00387
                                       )
OXFORD PAINTING CO.                    )
        a/k/a Oxford Painting, Co. et al.   )
                                       )
                       Defendants      )

### DECLARATION OF SANFORD G. ROSENTHAL

Sanford G. Rosenthal, Esquire declares and states, the following:

1.      I am a shareholder with the law firm of Jennings Sigmond and presently serve as

counsel to the International Painters and Allied Trades Industry Pension Fund ("Pension Fund")

in this case.  I am submitting this Declaration to document the attorneys' fees and costs which

the Pension Fund has incurred in this case through May 3, 2007.

Case Fees

2.      Attached as Exhibit 5 to Plaintiff's Motion for Entry of Judgment by Default, and

incorporated herein by reference, is a list showing all work performed by the office of Jennings

Sigmond, P.C. and related costs in connection with the preparation of the Complaint and the

Motion for Entry of Judgment by Default against Oxford Painting Co. a/k/a Oxford Painting, Co.

*et al.* in this action through May 3, 2007.  The listing was prepared from contemporaneous

attorney time and expenses records and bills, the originals of which are maintained in the regular

business records of Jennings Sigmond. Each piece of work is separately coded and the work

performed is described.  The fees relevant to this case are $3,374.00 and expenses are $603.24

for a total of $3,977.24.

182452-1



3.    The identity of those performing services related to this matter and normal hourly rates are as follows.

| INITIALS | NAME | TITLE | HOURLY RATE |
|----------|------|-------|-------------|
| SGR | Sanford G. Rosenthal | Shareholder | $200.00 |
| JAF | Jerome A. Flanagan | Associate | $200.00 |
| CTM | Cathy T. Morton | Paralegal | $ 70.00 |

4.    Plaintiffs only seek judgment for fees in the bills, which reflect a special fee schedule with the International Painters and Allied Trades Industry Pension Fund for a uniform $200.00 per hour rate for all lawyers and $70.00 per hour for paralegals and clerks.

Attorney Background and Experience

5.    Sanford G. Rosenthal.  Sanford G. Rosenthal is a firm shareholder and co-leader of the ERISA practice and has practiced law for 23 years. He received his undergraduate education at Pennsylvania State University, where he graduated in 1971. He worked as Audit Manager and Office Manager in the administrative team for the Teamsters Health and Welfare and Pension Funds of Philadelphia and Vicinity from 1971 through 1980. Mr. Rosenthal attended the Dickinson School of Law, where he was awarded the Degree of Juris Doctor in 1983.  Mr. Rosenthal is a member of the Bar of the Supreme Court of Pennsylvania and the District of Columbia Bar. He is also admitted to practice before the United States Court of Appeals for the Third Circuit and the United States District Courts for the Eastern and Middle Districts of Pennsylvania. His practice concentrates on the representation of multiemployer benefit funds in delinquency litigation and counseling. A sample of his litigation experience is available in 32 published cases that be obtained through a Westlaw search for "AT ("Sanford G. Rosenthal") and Jennings" in the FPENS-CS library.

182452-1

6.      <u>Jerome A. Flanagan</u>. Jerome A. Flanagan, an associate in the firm, has practiced law for three (3) years. He graduated in 2000 from the University of Scranton, with a Bachelors Degree in English.  He received his law degree in 2003 from Syracuse University. Following law school, Mr. Flanagan served as a judicial clerk in Lackawanna County, Pennsylvania. Prior to joining Jennings Sigmond, P.C., Mr. Flanagan practiced insurance defense in the Philadelphia area.

7.      <u>Catherine T. Morton</u>. Catherine T. Morton is a Paralegal in the Jennings Sigmond office. She has been with the office for six (6) years and is experienced in corporate computer database research, electronic filing procedures throughout the country and preparation and documentation of service of complaints and other pleadings for employee benefit collections matters, in addition to other skills.

<u>Legal Market Benchmark</u>

8.      The time and fees charged in this case are reasonable based on prevailing market rates for similar services by lawyers of reasonably comparable skill, experience and reputation in both the Philadelphia and District of Columbia markets.

9.      My opinion that the time and fees are reasonable is based on a number of factors, including the following.

(a)      We serve as counsel or co-counsel to over 20 multiemployer employee benefit funds groups.  The firm currently has 16 lawyers, with a dedicated benefits department of six (6) lawyers plus part-time work by three (3) other lawyers in the labor practice.  The work is specialized and our competition often is large corporate firms with both employee benefits and federal litigation experience.  In my experience, our fees are normally substantially lower than the charges of larger firms.

182452-1

(b)      The flat rate is this case is consistent with market rates in published surveys by Altman Weil, a leading law firm consultant.  A true and correct copy of the Altman Weil data is attached as Exhibit 6.  Specifically, Altman Weil found a median hourly rate in 2005 of $195 for associates in the Middle Atlantic region (encompassing both Philadelphia and the District of Columbia) and a range up to $273 per hour at the 90th percentile. See Associate Hourly Billing Rates (March 10, 2006), reprinted from http://www.altmanweil.com/PracticeSpecialtiesRates/. The median rate for partners (shareholders) in employee benefits litigation was $305 per hour, *id.*, Practice Specialties and Hourly Rates (October 1, 2005),   A $200 rate in 2006 is only a 2.56% increase over the 2005 median for associates only.

(c)      The fees are consistent with market ranges in a 2004 Ohio bar association survey, downloads.ohiobar.org/conventions/convention2005/session508%20Economics%20of%20Law.pdf, especially pages 26 and exhibit 27, especially after giving weight to increases from 2004 to 2006 (roughly 5% per year on average in the Ohio survey) and regional differences reflected in Altman Weil data, showing an 8.33% higher rate in median associates' rates in the Middle Atlantic region ($195) over the East North Central region covering Ohio ($180)).  A true and correct copy of the 2004 Ohio bar association survey is attached as Exhibit 7.  The Ohio survey showed median hourly associate rates in the comparable downtown Cleveland, Cincinnati and Columbus areas of $200 - $235 per hour, ranging up to $ 334 - $359 at the 90th percentile. See, Exhibit 7 (excerpt page 26).  It also shows that a $70 per hour paralegal rate is less than the median rate for 5 years experience in Ohio, without adjustment for regional differences, Exhibit 7 (Ex. 27).

182452-1

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information and belief.

Pursuant to 28 U.S.C. § 1746, I declare under
penalty of perjury that the foregoing is true and
correct.

Signed on: <u>May 4, 2007</u>          <u>s/ Sanford G. Rosenthal</u>
                                      SANFORD G. ROSENTHAL, ESQUIRE
                                      (I.D. NO. 478737)
                                      The Penn Mutual Towers, 16th Floor
                                      510 Walnut Street, Independence Square
                                      Philadelphia, PA 19106-3683
                                      (215) 351-0611/615
                                      Attorneys for Plaintiff


OF COUNSEL:
JEROME A. FLANAGAN
Jennings Sigmond, P.C.
510 Walnut Street, Suite 1600
Philadelphia, PA 19106
(215) 351-0660

182452-1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND | ) ) ) |
| Plaintiff | ) |
| v. | ) |
| | ) |
| OXFORD PAINTING CO. a/k/a Oxford Painting, Co. et al. | ) ) ) |
| Defendants | ) |

CIVIL ACTION NO.
1:07-CV-00387

**JENNINGS SIGMOND, P.C. May 2007 ATTORNEYS' FEES**

| Date | Attorney | Task | Time |
|---|---|---|---|
| 5/3/2007 | JAF | Review of correspondence from Peggy Gilbert; Review of Montemore Declaration; Review and Revision of Attorney Declaration; Review and Revision of Motion for Default Judgment; Review and Revision of Memorandum of Law and Proposed Order; Review of Exhibits | 4.7 |

|  | **TOTAL** | **4.7** |
|---|---|---|

May 2007 Summary
JAF   4.7 Hrs. x $200          = $ 940.00
      2/07 – 4/07 Fees & Costs  = $ 3,037.24
          **Grand Total**       = **$ 3,977.24**

182452-1


EXHIBIT
5

# Jennings Sigmond, P.C.
## Time And Expense Details

Report ID: OT2025 - 11132
Friday, May 04, 2007

Printed By   MHT
Page        1

| Client | Client Reporting Name | Matter | Matter Reporting Name | | | Billing Timekeeper |
|---|---|---|---|---|---|---|
| PTINTF | IUPAT Industry Pension Fund | 28719 | Oxford Painting Co. | | | Sigmond, Richard B. |

Beginning To End

### Unbilled Time

| Date | Timekeeper | Hours Worked | Hours To Bill | Rate | Amount | Task | Activity | Narrative |
|---|---|---|---|---|---|---|---|---|
| 4/25/2007 | JAF | 2.60 | 2.60 | 200.00 | $520.00 | | | Review of Documents; Preparation of Request to Enter Default; Preparation of Motion for Default and Supporting Memorandum |
| 4/26/2007 | JAF | 1.90 | 1.90 | 200.00 | $380.00 | | | Review of Correspondence from P. Gilbert re: updated delinquency Review of Documents; Review of attorneys fees and costs Preparation of Montemore Declaration |
| 4/30/2007 | JAF | 3.60 | 3.60 | 200.00 | $720.00 | | | Review of Documents; Review and Revision of Motion for Default Judgment; Memorandum and Supporting Affidavits |

### Unbilled Time
| Totals | | 8.10 | 8.10 | | $1,620.00 | | | |
|---|---|---|---|---|---|---|---|---|

### Unbilled Expenses

| Date | Amount | Exp Code | Narrative |
|---|---|---|---|
| 4/19/2007 | $198.10 | 7100 | Service Fee |

### Unbilled Expenses
| Totals | $198.10 |
|---|---|

### Billed Time

| Date | Timekeeper | Hours Worked | Hours On Bill | Rate | Amount | Task | Activity | Narrative |
|---|---|---|---|---|---|---|---|---|
| 2/8/2007 | SGR | 0.40 | 0.40 | 200.00 | $80.00 | | | Review of Correspondence from Fund regarding New Delinquency Case Review of Documents Preparation of Intake Litigation Memo |
| 2/9/2007 | JAF | 0.50 | 0.50 | 200.00 | $100.00 | | | Review of Documents re: new delinquency case |
| 2/15/2007 | SGR | 0.50 | 0.50 | 200.00 | $100.00 | | | Review and Revision of Complaint and Cover Forms |
| 2/16/2007 | SGR | 0.10 | 0.10 | 200.00 | $20.00 | | | Review of Correspondence from P. Gilbert Letter to P. Gilbert |
| 2/16/2007 | JAF | 2.50 | 2.50 | 200.00 | $500.00 | | | Review of Documents; Computer Research re: corporate info Preparation of complaint Letter to court re: complaint Review of Correspondence from P. Gilbert5t Memo to File Review of updated delinquency |

| Post Date | Status | Entry Date | Original Post Period | Original Post Year |
|---|---|---|---|---|
| 02/21/2007 | Current Period | 02/16/2007 | 2 | 2007 |

| Date | Timekeeper | Hours Worked | Hours On Bill | Rate | Amount | Task | Activity | Narrative |
|---|---|---|---|---|---|---|---|---|
| 2/26/2007 | CTM | 0.20 | 0.20 | 70.00 | $14.00 | | | Review of Electronic Court Documents regarding Summons and Complaint |

**Jennings Sigmond, P.C.**
**Time And Expense Details**

Report ID:  OT2025 - 11132
Friday, May 04, 2007

Beginning To End

**Billed Time**

| Totals | 4.20 | 4.20 | $814.00 |
|--------|------|------|---------|

**Billed Expenses**

| Date | Amount | Exp Code | Narrative |
|------|--------|----------|-----------|
| 2/13/2007 | $350.00 | 7100 | Filing Fee - Complaint |
| 2/20/2007 | $8.25 | PO | Postage Charges |
| 3/1/2007 | $26.67 | COPY | Photocopies |
| 3/1/2007 | $15.26 | COPY | Photocopies |
| 3/1/2007 | $4.96 | CRDB | Computer Research - Dun & Bradstreet |

**Billed Expenses**

| Totals | $405.14 |
|--------|---------|

| | Hours Worked | Hours To Bill | Fee Amount | Expense Amount | Total Amount |
|--|-------------|---------------|------------|----------------|--------------|
| Report Totals | 12.30 | 12.30 | $2,434.00 | $603.24 | $3,037.24 |

*** End Of Report ***

# Associate Hourly Billing Rates by Region



| Region | Median | 90th Percentile |
|---|---|---|
| New England | $185 | $250 |
| Middle Atlantic | $195 | $273 |
| South Atlantic | $190 | $270 |
| E. So. Central | $170 | $220 |
| W. So. Central | $175 | $240 |
| E. No. Central | $180 | $275 |
| W. No. Central | $145 | $190 |
| Mountain | $175 | $250 |
| Pacific | $195 | $290 |

**Source: Altman Weil Survey of Law Firm Economics
2005 Edition**

See following page for states included
in each region.



**EXHIBIT**

# Census Regions and Divisions of the United States





# Median Hourly Billing Rates
## Litigation Specialties

Top Five Hourly Rates

Equity and Non-Equity Partners

| Antitrust | IP | Tax | Employee Benefits | Criminal |
|-----------|------|------|-------------------|----------|
| $380 | $330 | $325 | $305 | $305 |

Source: Altman Weil Survey of Law Firm Economics 2005 Edition



**OSBA**

# THE 2004 ECONOMICS OF LAW PRACTICE IN OHIO SURVEY

## Introduction

During the spring of 2004, the Ohio State Bar Association, Section on Solo, Small Firms and General Practice (OSBA) surveyed the Ohio legal community on the economics of law practice. Two online surveys were utilized, replacing the single mail-based survey instrument provided in past years.

With respect to the economics of law practice, similar studies were undertaken in 2001, 1998, 1994 and 1990. The objectives of these studies were to determine, among other things:

- current demographics of practicing attorneys;

- attorney net income by practice category, gender, field of law, office location, work status, years in practice and firm size;

- associate, legal assistant, and secretary compensation by years of experience and office location;

- prevailing average hourly billing rates for attorneys by a variety of indicators, and rates for legal assistants by years of experience, firm size and office location;

- attorney time allocated to billable and non-billable professional activities; and

- overhead expenses associated with maintaining a private practice by office location and firm size.

Attorneys can compare themselves and their firms against "norms" established by the aggregation of survey data. Time series information is also provided to denote trends. Norms include statistics that are organized by combinations of office location, firm size, gender, work status (full-time vs. part-time), practice class, area of legal concentration and years of practice.

The above information has been consolidated into this reference to help guide attorneys as they plan and manage their professional lives.

For 2004, a survey dedicated to law office technology and marketing issues was also fielded at the same time as the economics survey. Findings from this survey are summarized as Current Issues on Law Office Technology and Marketing in Ohio, 2004 and are available at www.ohiobar.org

© 2004 Ohio State Bar Association. All rights reserved.

**EXHIBIT**

1

IV.    **BILLING RATES AND PRACTICES**

    A.    Takeaways.

        1.    The median hourly billing rate for all attorneys was *$175* for 2004 and *$110* for 1994. The average annual rate of increase in hourly billing rates during this time period was *5.9%*.

        2.    Rates have increased the most in *suburban Cincinnati* (7.3% per year) and least in *suburban Columbus* (2.5%).

        3.    Rates increased most for *partners in firms with 8+ partners* (5.9%) and least for *partners in firms with two to seven partners* (3.7%).

        4.    *Rates increased the most for respondents in* firms with two to five attorneys (6.05%) and least for respondents in *firms with more than 20 attorneys* (4.2%).

        5.    Rates increased the most for *estate planning attorneys* (9.5%) and *tax attorneys* (7.6%) and least for *bankruptcy* (2%) and *municipal/public entity* attorneys (- 1%).

        6.    Fifty-six percent of respondents had *not changed* their rates in one year or more.

        7.    When rates are raised, the prevalent increase is *6-10%* (41% of respondents).

        8.    *Uncollectibles* (greater than 2% of fees billed) are increasing. The prevalent range is *3-8% of fees billed* (33% in 2004 and 30% in 2000).

        9.    Attorneys are *increasingly adding service charges* to delinquent accounts where applicable (30% in 2004 compared with 20% in 1990).

    B.    Implications.

        1.    There is still pricing power for legal services despite intense competition and an ever growing supply of attorneys.

        2.    Existing and new practice management benchmarks should be available, especially for solos and small firm practicing attorneys, to enable relative standing self assessments.

V.    **ATTORNEY TIME ALLOCATIONS**

    A.    Takeaways.

        1.    The median value for *total hours* worked in 2004 rose to *50* from *48* in 1990 (2500 hours per year on a 50-week year).

**Law Firm Billing Rates and Billing Practices**

## 2004 Attorney Hourly Billing Rates

The reported 2004 median hourly billing rate is $200. The average is $206. While several interacting factors affect the setting and application of hourly billing rates, Exhibit 21 includes three discrete factors: respondents' firm size, years in practice and office location, while Exhibit 22 identifies respondents' primary source of income, and practice category.

**Exhibit 21**    **2004 HOURLY BILLING RATES BY FIRM SIZE, YEARS IN PRACTICE AND OFFICE LOCATION**

| | | | Value by Percentile | | |
|---|---|---|---|---|---|
| Size of Firm | N | Mean | 25th | Median | 75th | 95th |
| 1 | 196 | $155 | $125 | $150 | $175 | $225 |
| 2 | 55 | 164 | 125 | 150 | 185 | 250 |
| 3-6 | 77 | 176 | 150 | 175 | 200 | 256 |
| 7-10 | 40 | 196 | 150 | 180 | 244 | 300 |
| 11-20 | 39 | 189 | 155 | 195 | 225 | 275 |
| 21-50 | 49 | 206 | 163 | 200 | 238 | 320 |
| 51+ | 72 | 249 | 186 | 240 | 300 | 377 |
| **Yrs. in Practice** | | | | | | |
| 5 or less | 70 | $147 | $125 | $143 | $175 | $222 |
| 6-10 | 78 | 164 | 125 | 150 | 190 | 250 |
| 11-15 | 65 | 185 | 150 | 180 | 228 | 296 |
| 16-25 | 131 | 184 | 150 | 165 | 220 | 306 |
| More than 25 | 183 | 200 | 150 | 190 | 230 | 340 |
| **Office Location** | | | | | | |
| Greater Cleveland | 121 | $200 | $150 | $185 | $238 | $350 |
| Greater Cincinnati | 61 | 199 | 150 | 180 | 245 | 325 |
| Greater Columbus | 120 | 194 | 150 | 180 | 233 | 300 |
| Greater Dayton | 25 | 179 | 150 | 175 | 193 | 296 |
| Northeast Region | 98 | 165 | 125 | 163 | 196 | 250 |
| Northwest Region | 47 | 152 | 120 | 150 | 175 | 263 |
| Southern Region | 56 | 155 | 125 | 150 | 175 | 250 |
| | | | | | | |
| Downtown Cleveland | 61 | $237 | $183 | $235 | $283 | $359 |
| Suburban Cleveland | 60 | 161 | 150 | 150 | 189 | 220 |
| Downtown Cincinnati | 40 | 213 | 153 | 200 | 271 | 368 |
| Suburban Cincinnati | 21 | 173 | 145 | 175 | 183 | 249 |
| Downtown Columbus | 67 | 217 | 165 | 210 | 260 | 334 |
| Suburban Columbus | 53 | 164 | 145 | 150 | 200 | 243 |
| Dayton | 25 | 179 | 150 | 175 | 193 | 296 |
| Canton | 12 | 154 | 116 | 153 | 183 | 250 |
| Akron | 41 | 186 | 150 | 190 | 223 | 273 |
| Toledo | 26 | 170 | 144 | 168 | 186 | 285 |
| Youngstown | 9 | 146 | 113 | 150 | 178 | 200 |
| Northeast Ohio | 36 | 149 | 125 | 138 | 188 | 225 |
| Northwest Ohio | 21 | 129 | 100 | 125 | 150 | 180 |
| Southeast Ohio | 16 | 155 | 125 | 150 | 188 | 250 |
| Southwest Ohio | 25 | 146 | 125 | 150 | 170 | 207 |
| Central Ohio | 15 | 171 | 150 | 165 | 185 | 250 |
| **All Attorneys** | 530 | $182 | $150 | $175 | $210 | $300 |

**Exhibit 22**      **2004 HOURLY BILLING RATES BY PRIMARY FIELD OF LAW AND PRACTICE CLASS**

| Primary Field of Law | N | Mean | 25th | Median | 75th | 95th |
|---|---|---|---|---|---|---|
| | | | | Value by Percentile | | |
| Administrative Law | 5 | $241 | $188 | $260 | $285 | $295 |
| Bankruptcy, Debtor | 18 | 135 | 115 | 150 | 168 | 190 |
| Collections | 10 | 146 | 119 | 135 | 164 | 250 |
| Corporate/Business Law | 48 | 201 | 150 | 183 | 225 | 340 |
| Criminal (Public Defendant) | 9 | 139 | 100 | 125 | 175 | 225 |
| Criminal (Private Defendant) | 12 | 154 | 125 | 150 | 173 | 250 |
| Domestic Relations/Family Law | 55 | 173 | 125 | 150 | 200 | 280 |
| Environmental Law/Natural Resources Law | 6 | 200 | 151 | 168 | 283 | 305 |
| General Practice | 14 | 136 | 118 | 132 | 161 | 185 |
| Health & Hospital Law | 6 | 203 | 148 | 195 | 263 | 300 |
| Intellectual Property | 10 | 216 | 174 | 223 | 250 | 300 |
| Labor Law (Management) | 6 | 185 | 150 | 168 | 236 | 255 |
| Employment Law (Management) | 25 | 187 | 138 | 175 | 238 | 324 |
| Employment Law (Labor) | 6 | 178 | 151 | 175 | 208 | 230 |
| Municipal/Public Entity Law | 8 | 164 | 111 | 138 | 225 | 305 |
| Product Liability | 5 | 226 | 138 | 205 | 325 | 425 |
| Personal Injury (Defendant) | 25 | 148 | 110 | 135 | 175 | 270 |
| Personal Injury (Plaintiff) | 43 | 179 | 150 | 160 | 200 | 300 |
| Professional Liability | 6 | 164 | 149 | 165 | 178 | 185 |
| Real Property Law | 26 | 164 | 125 | 150 | 195 | 315 |
| Taxation | 7 | 231 | 175 | 220 | 295 | 300 |
| Trial Practice, not PI (General Civil) | 20 | 190 | 140 | 177 | 200 | 415 |
| Trial Practice, not PI (Commercial) | 20 | 224 | 181 | 210 | 276 | 387 |
| Estate Planning/Wealth Management | 36 | 209 | 175 | 205 | 233 | 308 |
| Probate, Decedents' Estates | 49 | 176 | 150 | 175 | 200 | 250 |
| Workers' Compensation (Plaintiff) | 6 | 167 | 125 | 150 | 213 | 250 |
| Other | 23 | 200 | 150 | 190 | 250 | 358 |
| **Practice Classification** | | | | | | |
| Sole Practitioner | 168 | $153 | $125 | $150 | $175 | $225 |
| Solo with 1+ associates | 42 | 181 | 150 | 175 | 203 | 259 |
| Space Sharer | 21 | 160 | 125 | 150 | 175 | 275 |
| Partner in Firm with 2-7 Partners | 114 | 184 | 150 | 175 | 221 | 300 |
| Partner in Firm with 8+ Partners | 88 | 249 | 196 | 240 | 300 | 381 |
| Associate in Firm with 2-7 Partners | 31 | 156 | 125 | 150 | 175 | 264 |
| Associate in Firm with 8+ Partners | 56 | 180 | 150 | 175 | 210 | 263 |
| **All Attorneys** | 530 | $182 | $150 | $175 | $210 | $300 |

## Hourly Billing Rates for Associates and Legal Assistants

The distribution of hourly billing rates for associates and legal assistants are summarized by years of experience in Exhibit 23, by office location (Exhibits 24 and 25), and by firm size (Exhibits 26 and 27).

**Exhibit 26** — **DISTRIBUTIONS OF 2004 HOURLY BILLING RATES FOR ASSOCIATES BY FIRM SIZE AND YEARS OF EXPERIENCE**

| Associate Billing Rate Category | Firm Size (Number of Attorneys) | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2 | 3-6 | 7-20 | 21+ | All |
| **No Experience** | | | | | |
| <$135 | 57.9 | 78.1 | 69.0 | 43.5 | 61.9 |
| $136-145 | 15.8 | 9.4 | 10.3 | 19.6 | 13.5 |
| $146-155 | 15.8 | 9.4 | 17.2 | 19.6 | 16.1 |
| $156-165 | | | 1.7 | 6.5 | 2.6 |
| $166-175 | 10.5 | | 1.7 | 4.3 | 3.2 |
| $176-199 | | | | 6.5 | 1.9 |
| $225-249 | | 3.1 | | | 0.6 |
| Total | 100% | 100% | 100% | 100% | 100% |
| **3 Years Experience** | | | | | |
| <$135 | 43.8 | 35.3 | 39.0 | 13.0 | 31.0 |
| $136-145 | 18.8 | 20.6 | 22.0 | 19.6 | 20.6 |
| $146-155 | 25.0 | 29.4 | 20.3 | 21.7 | 23.2 |
| $156-165 | | 11.8 | 6.8 | 13.0 | 9.0 |
| $166-175 | 6.3 | 2.9 | 6.8 | 23.9 | 11.0 |
| $176-199 | 6.3 | | 5.1 | 8.7 | 5.2 |
| Total | 100% | 100% | 100% | 100% | 100% |
| **5 Years Experience** | | | | | |
| <$135 | 12.5 | 24.0 | 25.0 | 4.3 | 16.9 |
| $136-145 | 25.0 | 8.0 | 10.7 | 10.6 | 11.0 |
| $146-155 | 12.5 | 40.0 | 25.0 | 10.6 | 22.1 |
| $156-165 | 12.5 | 12.0 | 17.9 | 17.0 | 16.2 |
| $166-175 | | 16.0 | 10.7 | 10.6 | 11.0 |
| $176-199 | 12.5 | | 10.7 | 29.8 | 15.4 |
| $200-224 | 25.0 | | | 14.9 | 6.6 |
| $225-249 | | | | 2.1 | 0.7 |
| Total | 100% | 100% | 100% | 100% | 100% |
| **10 Years Experience** | | | | | |
| <$135 | 33.3 | 14.8 | 19.5 | 5.4 | 14.9 |
| $136-145 | 11.1 | | 4.9 | 2.7 | 3.5 |
| $146-155 | | 22.2 | 14.6 | 5.4 | 12.3 |
| $156-165 | 22.2 | 7.4 | 4.9 | 5.4 | 7.0 |
| $166-175 | | 14.8 | 14.6 | 16.2 | 14.0 |
| $176-199 | | 18.5 | 26.8 | 18.9 | 20.2 |
| $200-224 | 22.2 | 18.5 | 14.6 | 18.9 | 17.5 |
| $225-249 | 11.1 | 3.7 | | 10.8 | 5.3 |
| $250+ | | | | 16.2 | 5.3 |
| Total | 100% | 100% | 100% | 100% | 100% |

Exhibit 27    DISTRIBUTIONS OF 2004 HOURLY BILLING RATES FOR
LEGAL ASSISTANTS BY FIRM SIZE AND EXPERIENCE

| Legal Assistant Billing Rate Category | Firm Size (Number of Attorneys) | | | | |
|---|---|---|---|---|---|
|  | 2 | 3-6 | 7-20 | 21+ | All Firms |
| **No Experience** | | | | | |
| $50 or less | 40.0 | 60.0 | 50.0 | 20.0 | 41.0 |
| $51-60 | 30.0 | 20.0 | 20.0 | 17.1 | 20.0 |
| $61-70 | 10.0 | 4.0 | 10.0 | 5.7 | 7.0 |
| $71-80 | 20.0 | 8.0 | 10.0 | 25.7 | 16.0 |
| $81-90 |  | 4.0 | 10.0 | 8.6 | 7.0 |
| $91-100 |  | 4.0 | 10.0 | 17.1 | 7.0 |
| $101-110 |  |  |  | 5.7 | 2.0 |
| Total | 100% | 100% | 100% | 100% | 100% |
| **3 Years Experience** | | | | | |
| $50 or less | 12.5 | 25.0 | 13.3 | 2.8 | 11.7 |
| $51-60 | 62.5 | 35.0 | 23.3 | 11.1 | 24.5 |
| $61-70 |  | 20.0 | 26.7 | 22.2 | 21.3 |
| $71-80 |  | 10.0 | 13.3 | 11.1 | 10.6 |
| $81-90 | 12.5 | 5.0 | 10.0 | 22.2 | 13.8 |
| $91-100 | 12.5 |  | 10.0 | 8.3 | 7.4 |
| $101-110 |  | 5.0 | 3.3 | 8.3 | 5.3 |
| $111-120 |  |  |  | 11.1 | 4.3 |
| >$120 |  |  |  | 2.8 | 1.1 |
| Total | 100% | 100% | 100% | 100% | 100% |
| **5 Years Experience** | | | | | |
| $50 or less | 16.7 | 4.5 | 8.6 | 2.9 | 6.2 |
| $51-60 |  | 27.3 | 17.1 | 5.9 | 14.4 |
| $61-70 | 66.7 | 22.7 | 11.4 | 14.7 | 18.6 |
| $71-80 | 16.7 | 31.8 | 34.3 | 11.8 | 24.7 |
| $81-90 |  | 4.5 | 14.3 | 11.8 | 10.3 |
| $91-100 |  |  | 11.4 | 17.6 | 10.3 |
| $101-110 |  | 9.1 |  | 11.8 | 6.2 |
| $111-120 |  |  |  | 11.8 | 4.1 |
| >$120 |  |  | 2.9 | 11.8 | 5.2 |
| Total | 100% | 100% | 100% | 100% | 100% |
| **10 Years Experience** | | | | | |
| $50 or less | 20.0 |  | 2.7 | 3.0 | 3.9 |
| $51-60 | 20.0 | 9.1 | 18.9 | 3.0 | 11.8 |
| $61-70 |  | 13.6 | 13.5 | 12.1 | 11.8 |
| $71-80 | 30.0 | 40.9 | 18.9 | 6.1 | 20.6 |
| $81-90 | 10.0 | 18.2 | 21.6 | 6.1 | 14.7 |
| $91-100 |  | 13.6 | 16.2 | 18.2 | 14.7 |
| $101-110 |  | 4.5 |  | 12.1 | 4.9 |
| $111-120 | 20.0 |  | 5.4 | 18.2 | 9.8 |
| >$120 |  |  | 2.7 | 21.2 | 7.8 |
| Total | 100% | 100% | 100% | 100% | 100% |

Exhibit 28 displays the impact of firm size on methods for client billing for legal assistants:

Exhibit 28    LEGAL ASSISTANT CLIENT BILLING METHODS BY SIZE OF FIRM, 2004

| Billing Method for Legal Assistants | Firm Size (Number of Attorneys) | | | | | |
|---|---|---|---|---|---|---|
|  | 1 | 2 | 3-6 | 7-20 | 21+ | All Firms |
| Included with Attorney Fee | 47.1 | 59.5 | 39.7 | 19.7 | 4.7 | 32.1 |
| Time | 42.9 | 35.1 | 55.2 | 73.8 | 87.5 | 60.7 |
| Fee Schedule | 8.6 | 5.4 | 5.2 | 3.3 | 6.3 | 5.9 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |